**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Chesapeake Exploration, L.L.C. v. Buell,* **Slip Opinion No. 2015-Ohio-4551.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-4551

CHESAPEAKE EXPLORATION, L.L.C., ET AL., *v.* BUELL ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Chesapeake Exploration, L.L.C. v. Buell,* Slip Opinion No. 2015-Ohio-4551.]**

*Oil and gas Leases—Dormant Mineral Act—R.C. 5301.56—Recorded lease of*
   *severed oil and gas rights is title transaction under R.C. 5301.56(B)(3)(a)*
   *that constitutes saving event to preclude severed mineral rights from being*
   *deemed abandoned and reunited with rights to corresponding surface*
   *property—Unrecorded expiration of recorded oil and gas lease and*
   *accompanying reversion to lessor of rights granted by lease is not title*
   *transaction that restarts 20-year clock under R.C. 5301.56.*

(No. 2014-0067—Submitted August 20, 2014—Decided November 5, 2015.)

ON ORDER from the United States District Court for the Southern District of Ohio,
   Eastern Division, Certifying Questions of State Law, No. 2:12-cv-916.

_____

## SYLLABUS OF THE COURT

1. A recorded oil and gas lease is a title transaction under R.C. 5301.56(B)(3)(a).

2. The unrecorded expiration of a recorded oil and gas lease and the accompanying reversion to the lessor of rights granted by the lease is not a title transaction that restarts the 20-year clock under the Dormant Mineral Act, R.C. 5301.56.

_____

**O'CONNOR, C.J.**

{¶ 1} In this case, which is before us on the certification of state-law questions by the United States District Court for the Southern District of Ohio, Eastern Division, we address whether, under Ohio's Dormant Mineral Act, codified in R.C. 5301.56, a recorded lease of severed oil and gas rights, or the expiration of that lease, is a title transaction that constitutes a saving event to preclude the severed mineral rights from being deemed abandoned and reunited with the rights to the corresponding surface property. We hold that a recorded oil and gas lease is a title transaction under R.C. 5301.56(B)(3)(a), but the expiration of such a lease is not.

## RELEVANT BACKGROUND

{¶ 2} The parties dispute who is the legal owner or holder of the mineral rights. The federal court provided the facts, circumstances, and allegations from which the legal questions of ownership arise.

### *The Leases*

{¶ 3} In 1958, Powhatan Mining Company severed the surface rights from the mineral rights of a 90.2063-acre parcel located in Harrison County by transferring the surface rights to Clarence and Anna Bell Sedoris and retaining the oil, gas, coal, or other mineral rights for itself and its successors. Powhatan transferred the mineral rights to North American Coal Corporation in 1959 when

the two companies merged. Over the years since then, both the surface and mineral rights have been the subjects of various transfers and transactions.

{¶ 4} The history of the mineral-rights leases is labyrinthine.

{¶ 5} North American Coal leased the mineral rights in 1973 and recorded the lease in Harrison County in February 1974, but the leased rights eventually reverted to North American Coal at the expiration of the lease term. The next lease of mineral rights was recorded in 1984, but in 1989, the lease expired by its terms, and the rights reverted again to North American Coal.

{¶ 6} In 2008, North American transferred the mineral rights to North American Coal Royalty Company ("Coal Royalty") by quitclaim deed.

{¶ 7} By the most recent lease, dated January 28, 2009, the lessor, Coal Royalty, ultimately leased the mineral rights, following multiple assignments, to Dale Property Services Penn, L.P., which then assigned its interest to the lessee Ohio Buckeye Energy, L.L.C. Dale Property Services reserved a 1.25 percent royalty interest, which it assigned to Dale Pennsylvania Royalty, L.P., in 2012 (the "2009 Lease").

{¶ 8} In October 2011, Buckeye Energy assigned a portion of its interest to Larchmont Resources, L.L.C. In November 2011, Buckeye Energy assigned another portion of its interest to CHK Utica, L.L.C.

{¶ 9} In December 2011, Buckeye Energy merged with Chesapeake Exploration, L.L.C., which resulted in Chesapeake holding the remainder of Buckeye Energy's interest in the 2009 lease.

{¶ 10} On December 30, 2011, Chesapeake transferred a portion of its interest to Total E&P USA, Inc., but retained the remainder.

{¶ 11} Currently, petitioner Coal Royalty is the record owner of the mineral rights. Petitioners CHK Utica and Larchmont lease a portion of the mineral rights by assignment. Petitioners Chesapeake and Total E&P are lessees

of the remainder of the lease with petitioner Dale holding a 1.25 percent royalty interest in the lease.

**{¶ 12}** The respondents are property owners who, through various transfers originating from the Sedorises, own surface rights to a portion of the 90-plus acres of property.[1]

**{¶ 13}** In October 2012, Chesapeake, CHK Utica, Larchmont, and Dale Pennsylvania Royalty ("Dale"), all claiming an interest in the leased mineral rights as lessees, filed a complaint in federal court to quiet title to the oil and gas rights against the respondent surface property owners, as well as against Coal Royalty and Total E&P. The surface property owners counterclaimed and also filed cross-claims against Coal Royalty and Total E&P to quiet title. Coal Royalty, Dale Property Services, and Total E&P were realigned as plaintiffs in the trial court action and are petitioners here together with Chesapeake, CHK Utica, Larchmont, and Dale.

### The Questions of State Law

**{¶ 14}** The federal court concluded that the interpretation of Ohio's Dormant Mineral Act in the context of an oil and gas lease is determinative of the case, but it declined to decide the questions before it, given the lack of available authority from Ohio courts. Finding no controlling precedent on the determinative issue in Ohio case law, the federal court certified the following questions to us for answers:

> 1. Is the recorded lease of a severed subsurface mineral estate a title transaction under the ODMA, Ohio Revised Code § 5301.56(B)(3)(a)?

---

[1] Dennis Elias owns 59.66 acres of the property. Jeffrey and Janice Elias own 10.37 acres. And the Ordronneaus own 20.17 acres of the property. Kenneth Buell was dismissed from the action and is not a party to this case.

2.  Is the expiration of a recorded lease and the reversion of the rights granted under that lease a title transaction that restarts the twenty-year forfeiture clock under the ODMA at the time of the reversion?

{¶ 15} Thus, the questions are limited to recorded leases, and we offer no opinion on any other kind of transaction that may have occurred in this case. Petitioners contend that we should answer both questions in the affirmative because the recorded oil and gas lease makes a mineral interest the subject of a title transaction under the plain language of R.C. 5301.56(B)(3)(a), and the same is true of the lease's expiration. But respondents assert that an oil and gas lease is a license, and therefore neither a recorded lease nor the expiration of that lease is a title transaction. Thus, they urge this court to answer both questions in the negative.

ANALYSIS

*Oil and Gas Leases*

{¶ 16} The oil and gas lease is central to the oil and gas industry. 1 Brown, Brown & Gillaspia, *The Law of Oil and Gas Leases*, foreword (2d Ed.2014). "The principal or basic consideration for a [mineral rights] lease is the agreement by the lessee to develop the premises for oil and gas and pay royalties thereon to the lessor." *Id.* at Section 3.01(2). In this context, "royalty" generally refers to the "share of the product or profit reserved by the owner of land for permitting another to develop his land for oil or gas." *Id*. at Section 6.01.

{¶ 17} In Ohio, during an oil boom in the mid-1960s, it was estimated that over three-fourths of Ohio was leased for oil and gas. Cissel, *Oil and Gas Law in Ohio*, Ohio Legislative Service Commission, Staff Research Report No. 63, at 13 (1965). With the recent advances in techniques for extracting oil and natural gas from shale beds, such as the Marcellus and Utica Shale regions underlying parts of eastern Ohio, oil and gas leases are potentially lucrative instruments for both

landowners and energy developers. Richardson, *Hite v. Falcon Partners: A Model Rule for Marcellus and Utica Shale States Precluding the Use of Delay Rental Payments to Extend the Primary Term in an Oil and Gas Lease*, 46 Akron L.Rev. 1133, 1135-1136 (2013). The lease provides a mechanism by which an owner of mineral rights can permit others to explore and exploit the land's mineral resources in exchange for royalties and other consideration. Brown at Section 3.01(2); *Garman v. Conoco, Inc.,* 886 P.2d 652, 656 (Colo.1994); Bibikos & King, *A Primer on Oil and Gas Law in the Marcellus Shale States*, 4 Tex.J. Oil Gas & Energy L. 155, 156-167 (2009).

{¶ 18} The difficulty arises when, as demonstrated in this case, the history of transfers, assignments, reservations, and leases involving the mineral rights creates confusion as to who holds legal ownership and the corresponding ability to lease the valuable mineral rights.

{¶ 19} We review the multiple ownership interests that may exist for a given mineral-rich tract of land.

{¶ 20} Oil and gas can be viewed as realty or as personalty depending on the location of the oil and gas relative to the land in which it lies.

{¶ 21} Ohio has long recognized that minerals underlying the surface, including oil and gas, are part of the realty. *Pure Oil Co. v. Kindall*, 116 Ohio St.188, 201-202, 156 N.E. 119 (1927); *Nonamaker v. Amos*, 73 Ohio St.163, 170-171, 76 N.E. 949 (1905); *Kelly v. Ohio Oil Co.*, 57 Ohio St. 317, 49 N.E. 399 (1897), paragraph one of the syllabus. While the mineral remains underground, it is "in place" and is "the same as any part of the realty." *Pure Oil* at 201; *Kelly* at 328 ("Petroleum oil is a mineral, and while in the earth it is part of the realty * * *"). The minerals may be severed from the rest of the realty for purposes of separate ownership. *Pure Oil* at 202; *Gill v. Fletcher*, 74 Ohio St. 295, 302-303, 78 N.E. 433 (1906).

**{¶ 22}** Ohio's view is consistent with the majority of the states, including neighboring states Pennsylvania and West Virginia, which enjoy the same oil and gas-rich shale beds. Bibikos & King, 4 Tex.J. Oil Gas & Energy L. at 158, fn. 11 ("Most jurisdictions agree that the mineral estate can be severed and transferred independently of the surface estate"). "Pennsylvania adheres to the ownership theory," *id.* at 171, and "[i]t is fairly well-settled that, like other states, West Virginia follows the ownership theory," *id.* at 184. *See also Marshall v. Mellon,* 179 Pa. 371, 373, 36 A. 201 (1897); *Robinson v. Milam*, 24 S.E.2d 236 (W.Va.1942), paragraph three of the syllabus.

**{¶ 23}** The owner who conveys the surface estate may retain an interest in the mineral estate by reservation. *Pure Oil* at 202. Although the surface land may be separately owned, we have recognized the "truism" that when the interests have been severed, neither the owner of the surface interest nor the owner of the mineral interest has full ownership" because "[e]ach has rights that are subject to the rights of the other." *Snyder v. Ohio Dept. of Natural Resources,* 140 Ohio St.3d 322, 2014-Ohio-3942, 18 N.E.3d 416, ¶ 13. "Unless the language of the conveyance by which the minerals are acquired repels such construction, a severed mineral estate is considered to include those rights to use of the surface as are reasonably necessary for the proper working of the mine and the obtaining of the minerals." *Quarto Mining Co. v. Litman*, 42 Ohio St.2d 73, 83, 326 N.E.2d 676 (1975).

**{¶ 24}** Through a lease, the owner of the mineral estate, whether or not also the owner of the surface estate, may convey to another the rights to the minerals that lie beneath the surface. *See, e.g., Brown v. Fowler*, 65 Ohio St. 507, 521, 524, 63 N.E. 76 (1902) (identifying an instrument granting the oil and gas, along with the land for the purposes of obtaining the oil and gas, as a lease, and not a license, for a definite and certain term); *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 128, 48 N.E. 502 (1897) (noting that even if the lease is termed a sale of all

the oil underlying the land, the oil remaining under the property after the lease expires belongs to the landowner). The effect of that transfer of mineral rights under a lease is at issue in this appeal.

### Ohio's Dormant Mineral Act

{¶ 25} In 1989, Ohio enacted the Dormant Mineral Act, codified in R.C. 5301.56, to address stale or abandoned mineral rights. Commonly, the mineral rights are severed from the surface rights of a parcel of land, and over time, sometimes repeatedly, the mineral rights may be further divided and transferred through various business and family transactions. These transactions, often spanning generations, make it difficult to trace the ownership of mineral interests and thus, establish current ownership status. The General Assembly devised the Dormant Mineral Act as part of the Marketable Title Act, R.C. 5301.47 et seq., to provide a mechanism to reunite abandoned mineral interests with the surface property interest in order to clear title and promote the use of the mineral rights for development and production.

{¶ 26} Pursuant to the current version of R.C. 5301.56, as amended in 2006, a mineral interest severed from the surface property rights will be deemed abandoned and reunited with the surface rights unless (1) a saving event has occurred in a 20-year window preceding the statutorily required notice by the owner of the surface rights and (2) the surface owner has followed the requisite procedural steps described elsewhere in the statute. The six possible saving events are:

(a) The mineral interest has been the subject of a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located.

(b) There has been actual production or withdrawal of minerals by the holder from the lands, from lands covered by a

8

lease to which the mineral interest is subject, from a mine a portion of which is located beneath the lands, or, in the case of oil or gas, from lands pooled, unitized, or included in unit operations * * *.

(c) The mineral interest has been used in underground gas storage operations by the holder.

(d) A drilling or mining permit has been issued to the holder * * *.

(e) A claim to preserve the mineral interest has been filed in accordance with division (C) of [R.C. 5301.56].

(f) In the case of a separated mineral interest, a separately listed tax parcel number has been created for the mineral interest in the county auditor's tax list and the county treasurer's duplicate tax list in the county in which the lands are located.

R.C. 5301.56(B)(3).

{¶ 27} The certified questions involve the saving event in subsection (a): that "[t]he mineral interest has been the subject of a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located."[2]

---

[2] The calculation of the relevant 20-year period differs between the original act in 1989, 142 Ohio Laws, Part I, 981, 986, and the 2006 amendment, 151 Ohio Laws, Part III, 5960, 5966. And the 1989 version of the act does not require notice by the owner of the surface rights to have the mineral interests deemed abandoned. Although the parties dispute which version of the act applies here, that question is not presented to us by the federal court. Nor are the notice and filing requirements of the act at issue here. We decline to address either issue.

Importantly, the 2006 amendments did not change the definition of a title transaction or the description of the saving event under R.C. 5301.56(B)(3)(a). Whether a recorded oil and gas lease, or the expiration of that lease, is a title transaction and hence a saving event under R.C. 5301.56(B)(3)(a) is the same analysis under either version of the act.

Notably, however, the effect of the 2006 amendment on rights claimed under the earlier version is an open question. The issue is pending before this court, including in the following cases: 2014-0803, *Walker v. Shondrick-Nau,* 7th Dist. Noble No. 13 NO 402, 2014-Ohio-1499; 2014-0804, *Corban v. Chesapeake Exploration, L.L.C.,* Certified Question of State Law, United

{¶ 28} At the time the General Assembly enacted the Dormant Mineral Act, one question, at least in the minds of the land-title insurance industry, was whether an oil and gas lease would meet the definition of a title transaction under the act so that it would serve as a saving event and preclude the leased mineral rights from being deemed abandoned. Title Topics: Ohio Land Title Association 5 (May 1989). We have not previously had the opportunity to provide guidance on this issue or, specifically, determine whether the language of the Dormant Mineral Act permits such an interpretation. Thus, this is a case of first impression.

{¶ 29} Answering the certified questions requires an interpretation of the term "title transaction" under the Dormant Mineral Act as well as a review of the nature of a recorded oil and gas lease under Ohio law. If the recorded lease or its expiration is a "title transaction" within the meaning of the act, we must next determine whether either qualifies as a saving event under R.C. 5301.56(B)(3)(a) that precludes the mineral rights from being deemed abandoned.

### *Is a recorded oil and gas lease a "title transaction" under the Dormant Mineral Act?*

{¶ 30} The first question asks whether the recorded lease of severed mineral rights is a title transaction under R.C. 5301.56(B)(3)(a). We answer this question in the affirmative.

### *What is a title transaction?*

{¶ 31} We start with the interpretation of "title transaction" under the Dormant Mineral Act. Our role in cases of statutory construction is to determine legislative intent by looking to the language of the statute and the purpose to be

---

States District Court, Southern District of Ohio, Eastern Division, No. 2:13-CV-246; 2014-1208, *Swartz v. Householder,* 7th Dist. Nos. 13 JE 24 and 13 JE 25, 2014-Ohio-2359; and 2014-1209, *Shannon v. Householder,* 7th Dist. Nos. 13 JE 24 and 13 JE 25, 2014-Ohio-5098.

accomplished by the statute. *Boley v. Goodyear Tire & Rubber Co.*, 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E.2d 448, ¶ 20.

{¶ 32} The Dormant Mineral Act does not define "title transaction." However, the Marketable Title Act, R.C. 5301.47 et seq., expressly encompasses R.C. 5301.56 and defines a "title transaction" as "*any* transaction affecting title to *any* interest in land, including title by will or descent, title by tax deed, or by trustee's, assignee's, guardian's, executor's, administrator's, or sheriff's deed, or decree of any court, as well as warranty deed, quit claim deed, or mortgage." (Emphasis added.) R.C. 5301.47(F).

{¶ 33} Respondents contend that because a lease is not mentioned in this definition and because an oil and gas lease does not affect title, it cannot be a "title transaction." Petitioners contend that a "title transaction," as defined in R.C. 5301.47(F), is not limited to the enumerated list and that an oil and gas lease is a title transaction because it affects title to an interest in land.

{¶ 34} We have long held that the use of the term "any" in a phrase encompasses "every" and "all" examples of the subject described. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 33; *Wachendorf v. Shaver*, 149 Ohio St.231, 240, 78 N.E.2d 370 (1948). Thus, we presume that the use of the term "any" to describe "transaction" and "interest" is intended here to encompass "every" and "all" transactions affecting title to "every" and "all" interests in land. The word "any," by definition, is not a word of limitation.

{¶ 35} Rather, the word "any" has a flexible meaning and should be interpreted in its context. *Wachendorf* at 239. Here, the definition uses the term "including" to list examples of qualifying transactions, not to limit them. The word "including" indicates a partial list. *Black's Law Dictionary* 880 (10th Ed.2014). It does not signify a limitation in the way that the terms "such as" or "similar to" might. Accordingly, we do not read the definition of "title

transaction" under R.C. 5301.47(F) to mean only those transactions enumerated in the statutory definition.

{¶ 36} Limiting the definition to the enumerated list, as respondents would have us do, requires deletion of the word "any" from the phrase, "any transaction affecting title to any interest in land." Likewise, limiting the definition to transactions that "alter who owns the property at issue," as the separate concurring and dissenting opinion would have us do, is an overly restrictive reading of the statutory definition. We refrain from disturbing the plain language of the statute in such a way. *See Cleveland Elec. Illum. Co. v. Cleveland,* 37 Ohio St.3d 50, 53-54, 524 N.E.2d 441 (1988); *Wachendorf v. Shaver*, 149 Ohio St. at 237, 78 N.E.2d 370 ("It is a general rule that courts, in the interpretation of a statute, may not take, strike or read anything out of a statute, or delete, subtract or omit anything therefrom"). If the General Assembly wanted to limit the qualifying title transactions to those transactions *transferring* title to *ownership* of land, it could have said so. Instead it defined a "title transaction" as "any" transaction affecting title to "any" interest in land.

{¶ 37} Indeed, other uses of the phrases "title transaction" and "interest in land" in R.C. Chapter 5301 demonstrate that the terms are not as limited as the separate concurring and dissenting opinion asserts. For example, R.C. 5301.49(A) describes certain interests to which a record marketable title is subject and provides that "easements, use restrictions, or other interests created prior to the root of title" should be identified in the chain of title by a "recorded title transaction" that created the "easement, use restriction, or other interest." Thus, a "title transaction" can mean a transaction that creates an easement or use restriction. And an easement or use restriction certainly falls within the category of "any interest in land."

{¶ 38} R.C. 5301.67 defines both a "conservation easement" and "agricultural easement" as "an incorporeal right or *interest in land*." (Emphasis

added.)  R.C. 5301.67(A) and (C).  Generally, "easement" is defined as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road)." *Black's Law Dictionary* at 622.  Thus, an "interest in land" is far broader than ownership of property and encompasses an interest in using the land, such as an easement.

{¶ 39} In sum, the plain language of R.C. 5301.47(F) is unambiguous.  A title transaction is "any transaction affecting title to any interest in land," which means that it is not limited to the transactions enumerated in the statute or to transactions that transfer an ownership interest.

*Is a recorded oil and gas lease a transaction that affects title to any*
*interest in land?*

{¶ 40} Where the statute's meaning is clear and unambiguous, we apply the statute as written.  *Boley*, 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E.2d 448, at ¶ 20.  Thus, we turn to the nature of a recorded oil and gas lease to determine if, through such a lease, the mineral interest has been the subject of a "transaction affecting title to any interest in land" within the meaning of R.C. 5301.56(B)(3).

{¶ 41} There is no question that oil and gas leases are unique, as they "seemingly straddle the line between property and contract: they are neither residential leases nor commercial contracts for the sale of goods."  Keeling & Gillespie, *The First Marketable Product Doctrine:  Just What Is the "Product"?*, 37 St. Mary's L.J. 1, 6 (2005).  "Oil and gas leases are unusual in that they are not technically leases at all."  Richardson, 46 Akron L.Rev. at 1144.

{¶ 42} There is general consensus among the states that an oil and gas lease creates a property interest, but there is disagreement about the nature of that property interest.  Keeling & Gillespie*,* 37 St. Mary's L.J. at 7.  Some states have held that it is a fee simple determinable "in which the lessee enjoys title to all of

the oil, gas, and other minerals * * * as long as the lease remain in effect," while others have concluded that it is an incorporeal interest in the minerals "in which the lessee enjoys the exclusive right to take all of the oil, gas, and other minerals." *Id.*

{¶ 43} To resolve this question under Ohio law, we look to our courts for historical guidance on the characterization of an oil and gas lease in Ohio.

{¶ 44} We addressed a related question more than a century ago in *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 48 N.E. 502 (1897). We described an oil and gas lease as "more than a mere license" because it created a "vested, though limited, estate in the lands for the purposes named in the lease." *Id.* at 129-130.

{¶ 45} The respondent property owners contend that any reliance on this court's decision in *Harris* is misplaced because it conflicts with our subsequent decision in *Back v. Ohio Fuel Gas Co.*, 160 Ohio St. 81, 113 N.E.2d 865 (1953). In its order certifying the questions now before us, the federal court stated that our decisions in *Harris* and *Back* "take divergent views of the nature of oil and gas leases" and that "neither concerns whether a lease of severed subsurface mineral rights is a title transaction under the [Dormant Mineral Act]." The divergence seems to have arisen from the different language used in the granting clauses of the instruments at issue.

{¶ 46} Significantly, in *Back*, the instrument at issue was not a lease. The instrument stated that the grantors " 'do give, grant, bargain, sell and convey unto the said grantee * * * all the oil and gas in and under the following described premises' " along with the right and privilege of operating on the premises to obtain the oil and gas. (Emphasis by *Back* court deleted.) *Id*. at 83. The grant of the oil and gas rights was "forever." *Id*. at 84. The court determined that the instrument was a license rather than a deed of conveyance granting real property. *Id*. at 86. Because the relevant statute required that licenses be recorded in the county's lease records, the court determined that recording the instrument in the

14

lease records rather than the deed records was sufficient to provide constructive notice to a purchaser. *Id.* at 90.

{¶ 47} In contrast, the instrument in *Harris*, which was indisputably a lease, " 'granted, demised, and let unto the [lessee], for the purpose and with the exclusive right of drilling, operating for petroleum, oil, and gas, all that certain tract of land * * *.' " 57 Ohio St. at 118, 48 N.E. 502. The court held:

> An instrument in such form is more than a mere license. It is a lease of the land for the purpose and period limited therein, and the lessee has a vested right to the possession of the land to the extent reasonably necessary to perform the terms of the instrument on his part.

*Id*. at 129-130.

{¶ 48} The differences in the language of the instruments at issue in *Harris* and *Back* are significant such that *Back* is not in direct conflict with *Harris*. The cases demonstrate that the nature of the instrument and its effect on the parties' property interest in the oil and gas is determined by the language of the granting clause.[3]

---

[3] The decision in *Back,* 160 Ohio St. 81, 113 N.E.2d 865, has led at least one commentator to question whether Ohio recognizes the ownership theory of mineral rights addressed above. *See* 1 Brown, *The Law of Oil and Gas Leases*, Section 3.02(2), fn. 37. This conclusion ignores that the issue in *Back* was limited to determining whether the instrument in question was required by law to be recorded. The court acknowledged the differing ownership views among the states, but did not declare one view or the other to be the law of Ohio. Nor did *Back* expressly overrule the numerous cases before it holding that oil and gas in place is realty subject to ownership.

Additionally, the Dormant Mineral Act defines "mineral interest" as "a fee interest in at least one mineral regardless of how the interest is created and of the form of the interest, which may be absolute or fractional or divided or undivided." R.C. 5301.56(A)(3). A "fee" in the property context means a "heritable interest in land." *Black's Law Dictionary* 732 (10th Ed.2014). Thus, there is little question that Ohio recognizes that a subterranean mineral estate is realty, capable of ownership and conveyance as such.

{¶ 49} But, for purposes of our analysis, this is a distinction without a difference. The General Assembly has recently made clear that both licenses and leases of oil and gas rights create an interest in real estate. R.C. 5301.09 ("In recognition that such leases and licenses create an interest in real estate * * *"). 2014 Sub.H.B. No. 9 (effective Mar. 23, 2015). As noted above, the preliminary question we must address under the Dormant Mineral Act is whether through an oil and gas lease, an interest in real estate, the mineral interest has been the subject of a transaction affecting title to any interest in land. Recent cases have attempted to resolve this question by highlighting the unique nature of an oil and gas lease.

{¶ 50} The Seventh District Court of Appeals recently decided the specific issue now before us in *Eisenbarth v. Reusser*, 2014-Ohio-3792, 18 N.E.2d 477 (7th Dist.).[4] *Eisenbarth* held that a recorded oil and gas lease is a title transaction under the Dormant Mineral Act. *Id.* at ¶ 30. In reaching that conclusion, the appellate court analogized an oil and gas lease to a mortgage, which is one of the enumerated examples of a title transaction in the statutory definition, even though it does not transfer title. *Id.* at ¶ 29-30. It held that a recorded oil and gas lease affects title in a manner similar to a mortgage because it is an encumbrance on title that "remains with the realty if title is transferred during its terms." *Id*. at ¶ 30.

{¶ 51} The decision in *Eisenbarth* is in accord with a decision of the Columbiana County Common Pleas Court, *Bender v. Morgan*, Columbiana C.P. No. 2012-CV-378 (Mar. 20, 2013). *Eisenbarth* at ¶ 22. In *Bender*, the common pleas court held that to qualify as a title transaction under the statute, the transaction need not be a conveyance in the traditional sense. *Bender* at 4. The court concluded that an oil and gas lease conveyed a fee simple determinable in

---

[4] The jurisdictional appeal in *Eisenbarth* has been accepted by this court. 141 Ohio St.3d 1488, 2015-Ohio-842, 26 N.E.3d 823.

the severed mineral rights subject to a reverter on the conditions described in the lease, and therefore, the lease constituted a title transaction. *Id*. at 4-5.

{¶ 52} *Bender* is not the only case to characterize an oil and gas lease as a unique type of lease that conveys a fee simple determinable. In *Kramer v. PAC Drilling Oil & Gas, L.L.C.*, 197 Ohio App.3d 554, 2011-Ohio-6750, 968 N.E.2d 64, ¶ 11 (9th Dist.), the Ninth District Court of Appeals described an oil and gas lease as granting a fee simple determinable to the lessee, who takes ownership of all minerals in place that the lessor intended to lease, subject to the possibility of reverter upon the occurrence of the termination events specified in the lease.

{¶ 53} In *Harris*, we recognized that "[t]he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument." *Harris,* 57 Ohio St. at 129, 48 N.E. 502. In *Harris*,

> the lessor, for a valuable consideration, granted, demised, and let the lands described to the lessee, for the purpose and with the exclusive right of drilling and operating for petroleum, oil, and gas for five years, and as much longer as oil and gas are found in paying quantities.

*Id.* This summary is substantially similar to "the lease forms used in practically all of the states where there is oil and gas activity." *See* 1 Brown, *The Law of Oil and Gas Leases*, Section 3.05. Under this language, this court determined that the lessee has a "vested right to the possession of the land to the extent reasonably necessary to perform the terms of the instrument." *Harris* at 130.

{¶ 54} Here, the 2009 Lease includes the following language:

> Lessor hereby leases exclusively to Lessee all the oil and gas * * * underlying the land herein leased, together with such exclusive

17

rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands * * *.

In exchange for the lessee's exclusive right to the oil and gas underlying the land and the concomitant use of the land, the lessor is entitled to a bonus, a delay rental payment per acre, and a royalty for oil and gas extracted. This language differs from the granting language in the lease in *Harris*, but not materially, because both instruments grant the lessee the exclusive right to the subterranean mineral estate owned by the lessor to develop and produce the oil and gas found therein.

{¶ 55} The 2009 Lease includes other provisions that demonstrate the sweeping rights and privileges to the mineral estate enjoyed by the lessee. For example, the lease specifies that in addition to all the oil and gas underlying the land leased, the lessee has "such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands." This expressly includes:

the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines * * *, to use non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof.

{¶ 56} The lease further restricts the use and control of the surface estate: "Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor

shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent."

{¶ 57} Additionally, "[a]ll rights, duties, and liabilities" under the lease are binding not only on the lessor, but also the lessor's successors and assigns. The lessee may surrender and cancel the lease, but there is no similar provision for the lessor. In fact, the lease "shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease" where the circumstances comport with the terms of the agreement.

{¶ 58} We find that by these or substantially similar terms, the mineral interest has been the subject of a title transaction because the oil and gas lease affects title to the surface and mineral interests in land in a number of ways.

{¶ 59} As discussed above, a "title transaction" as defined in R.C. 5301.47(F) is not limited to a transaction that alters an ownership interest. Transactions creating interests like easements or use restrictions are also title transactions. This is consistent with the meaning of the word "title," which, as a concept rather than a legal instrument, is defined as "[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property." *Black's Law Dictionary* at 1712.

{¶ 60} The rights and privileges granted under an oil and gas lease, although limited to the purposes of the lease, are sufficiently vast to affect the possession and custody of the mineral estate, even if not its ownership. As this court recognized in *Harris*, the oil and gas lease grants the lessee a "vested right to the possession of the land" for the purposes of the lease. *Id.,* 57 Ohio St. at 130, 48 N.E. 502. Because the lessee also enjoys reasonable use of the surface estate to accomplish the purposes of the lease, the lease also similarly affects the surface estate. Thus, the lease affects the possession and custody of both the mineral and surface estates.

{¶ 61} The lease in this case grants the lessee an unequivocal and exclusive right to the mineral estate for a fixed term plus an indefinite extended term upon the happening of certain conditions, such as actual production of oil and gas or a prescribed payment to the lessor. Based on the vested nature of this grant, the oil and gas lease has been construed as transferring to the lessee a fee simple determinable in the mineral estate with a reversionary interest retained by the lessor that can be triggered by events or conditions specified in the lease. *Harris* at 129-130. Even if the lessor conveys title to the surface or mineral estates during the lifetime of the lease to a third party, the lease is binding on those successors and is therefore an encumbrance that remains with the realty. *Eisenbarth*, 2014-Ohio-3792, 18 N.E.3d 477, ¶ 30. A purchaser would take either estate subject to the lease and the vested right of the lessee.

{¶ 62} During the lease, the lessor effectively relinquishes his or her ownership interest in the oil and gas underlying the property in favor of the lessee's exclusive right to those resources. In lieu of an ownership interest, the lessor typically maintains only a royalty interest in the oil and gas as negotiated in the terms of the instrument, along with a reversionary interest if the lease does not continue past the primary term by the happening of some enumerated condition. Although the lessor may continue to own the mineral estate on paper, the vast and exclusive rights conveyed by the lease grant to the lessee the custody and use of the mineral estate and any oil and gas therein. Thus, during the lease, the lessor and mineral estate owner relinquishes all but an interest in the bonus, delay rental, and royalty payments provided for in the lease.

{¶ 63} Additionally, a recorded lease in the chain of title notifies all others with a potential interest in the surface or the mineral estate that the land is encumbered. An oil and gas company searching land records for potential leasable mineral estates would find an estate already encumbered by a lease. In this way, the lease resembles more of an encumbrance than an easement or a

mortgage. The lease forecloses the ability of the lessor or any third party to freely access the property for exploration, development, and extraction of mineral resources.

{¶ 64} In addition to affecting the value of the property, the lease also affects the transferability of the surface and mineral estates and the right of the lessor to use the surface and mineral estates without restriction, and ultimately, grants title in the oil and gas underlying the property to the lessee during the term of the lease. This effect on ownership, possession, and custody is an inherent attribute of an oil and gas lease.

{¶ 65} Even if the lease transfers to the lessee something less than a determinable fee,[5] the effect is the same when the instrument grants the exclusive right to the mineral estate, i.e., the exclusive right and privilege to possess, use, and alter the estate to explore, develop, and produce oil and gas resources found therein.

{¶ 66} Thus, under R.C. 5301.47(F), the recorded oil and gas lease constitutes a title transaction because it affects title to the surface and mineral owners' interests in land. And it is therefore a saving event under R.C. 5301.56(B)(3)(a) because "[t]he mineral interest has been the subject of a title transaction that has been filed or recorded" in the appropriate county recorder's office.[6]

{¶ 67} We turn now to the second certified question.

---

[5] The nature of the instrument is not a dispute presented to us for resolution. Nor is the enforceability of its provisions. The federal court has asked this court to determine whether a recorded oil and gas lease is a title transaction under the Dormant Mineral Act. Accordingly, we assume that the instrument is a lease.

[6] Whether the lease is a title transaction is only one element of the saving event described in R.C. 5301.56(B)(3)(a). It is also required that the mineral interest has been the subject of the title transaction that has been filed or recorded in the county recorder's office. R.C. 5301.56(B)(3)(a). The questions certified to us by the federal court presume a recorded lease. And the mineral rights are the very subject of an oil and gas lease. Thus, neither of these elements is in controversy for purposes of answering the first certified question.

***Is the expiration of a recorded lease and the reversion of the rights granted under that lease a title transaction that restarts the 20-year clock under the Dormant Mineral Act?***

**{¶ 68}** The second question asks whether the expiration of the recorded oil and gas lease and the reversion of the rights granted under that lease is also a title transaction that restarts the 20-year forfeiture clock under the Dormant Mineral Act. We answer this question in the negative. The mere unrecorded expiration of a recorded lease and the reversion of rights cannot restart the clock.

**{¶ 69}** In certifying the question, the federal court found no authority from this court on this issue. So it looked to a decision from the Michigan Supreme Court, *Energetics, Ltd. v. Whitmill*, 442 Mich. 38, 497 N.W.2d 497 (1993). In *Energetics*, the Michigan court considered the Michigan Dormant Minerals Act ("MDMA"), Mich.Comp.Laws 554.291 et seq., which provides that any interest in a severed oil and gas interest shall be deemed abandoned unless a certain event occurs within a 20-year period, including a transfer of the interest by recorded instrument. Mich.Comp.Laws 554.291(1). The court concluded that a transfer of an interest in oil and gas occurs both when a recorded lease with a primary term of less than 20 years takes effect and at the termination of that lease. *Id.* at 47 and 51. Therefore, both events trigger the commencement of a 20-year period during which the mineral rights cannot be deemed abandoned. *Id.* at 51. But the federal court stated that while the analysis in *Energetics* was instructive, it was not binding, given differences in the definition of a saving event between Ohio's Dormant Mineral Act and the MDMA.

**{¶ 70}** We conclude that the decision in *Energetics* is neither persuasive nor instructive here because the relevant language in the two statutory schemes differs for purposes of this case. In the Michigan statute, a mineral interest is deemed abandoned unless, during a 20-year period, the interest has been "sold, leased, mortgaged, or transferred by instrument recorded" in the appropriate

county office.   Mich.Comp.Laws 554.291(1).   In Ohio, however, the mineral interest is saved if it is "the subject of a title transaction that has been filed or recorded in the office of the county recorder."   R.C. 5301.56(B)(3)(a).   Thus, Ohio requires a "title transaction," i.e., *any* transaction that *affects title* to *any* interest in land, R.C. 5301.47(F), while Michigan requires a *transfer of an interest in oil and gas.*

**{¶ 71}** The parties dispute whether the Ohio statute is narrower or broader than Michigan's, but whichever view is correct, the fact remains that our General Assembly chose language to describe a saving event that is far different from the language in the Michigan statute.[7]   We find that the statutory differences are significant enough to decline to adopt the analysis in *Energetics* for determining whether the expiration of an oil and gas lease constitutes a saving event under Ohio's Dormant Mineral Act.

**{¶ 72}** Petitioners contend that three Ohio courts have held that the release of rights under an oil and gas lease qualifies as a title transaction.   *See McLaughlin v. CNX Gas Co.,* N.D.Ohio No. 5:13CV1502, 2013 WL 6579057, at \*5; *Schucht v. Bedway Land & Minerals Co.,* Harrison C.P. No. CVH 2012-0010, at 9 (Apr. 21, 2014) (citing *McLaughlin*); *Davis v. Consolidation Coal Co.*, Harrison C.P. No. CVH-2011-0081, at 3, 7 (Aug. 28, 2013).   The court in *McLaughlin* summarily concluded that because "the lease itself was a title transaction, there can be no dispute that the release of rights under that lease qualifies as a title transaction as well." *Id.* at \*3.   And *Schucht* and *Davis* are not helpful here, as they both involved a formally recorded release of rights, not the

---

[7] The General Assembly considered, but rejected, the language used by Michigan.   When the Dormant Mineral Act was introduced, Ohio contemplated language similar to that used in the Michigan statute.   117th General Assembly S.B. No. 223, as introduced, which, at R.C. 5301.56(B)(2)(a), stopped the 20-year clock if the mineral interest had been "conveyed, leased, transferred, or mortgaged by an instrument filed or recorded" in the appropriate county recorder's office.   The legislation as enacted, however, referred to a "title transaction" as a saving event rather than an interest sold, leased, mortgaged, or transferred.   R.C. 5301.56(B)(3)(a).

automatic expiration and reversion of rights under the terms of an oil and gas lease. The issue of a formal transaction releasing rights under a lease is not before us in this case.

**{¶ 73}** These cases do not persuade us that the unrecorded expiration of a lease constitutes a title transaction. It is self-evident that the termination or expiration of a lease returns the lessor and the mineral estate to the status quo prior to the lease. Upon expiration, the lessee loses his status as lessee by virtue of the terms of the agreement and no longer has an exclusive, vested right to the mineral estate. Thus, the expired or terminated lease no longer affects the lessor's title in the mineral estate.

**{¶ 74}** As noted, we are not presented with a *recorded* termination or expiration of a lease. The Dormant Mineral Act requires a title transaction to be filed or recorded in the county recorder's office in order to constitute a saving event. R.C. 5301.56(B)(3)(a). This requirement furthers the legislative purpose of "simplifying and facilitating land title transactions," R.C. 5301.55, by providing record notice of title activity involving the mineral rights.

**{¶ 75}** When an oil and gas lease expires by its terms or by operation of law, however, there is no record notice on the chain of title that the mineral rights have reverted to the lessor unless the lessee takes the additional step of recording a formal release. In contrast, the commencement of a lease with its accompanying recordation is a clear, fixed, and transparent event that provides notice to anyone searching the record of title.[8] Thus, even if the automatic expiration of an oil and gas lease were a "title transaction," it would not rise to the

---

[8] R.C. 5301.09 mandates the recordation of an oil and gas lease and states that all oil and gas leases, licenses, and assignments "shall be filed for record and recorded in such lease record without delay." Failure to record the lease renders the lease invalid, unless the lessee has actual and open possession of the leasehold estate. *Id.* Although the statute also requires that the lessee or his successors or assigns "shall have such lease released of record" when it is forfeited by the action or inaction of the lessee, or when the term of the lease has expired, there is no similar statutory effect on the validity of the lease for failure to record the release.

level of a saving event under R.C. 5301.56(B)(3)(a) when it is not filed or recorded as required by the statute.

{¶ 76} But petitioners contend that the statute's recording requirement is satisfied by the recorded lease itself because it provides notice of both the lease term and the expiration date. Petitioners further contend that the lease itself should stop the 20-year clock for the entire term of the lease because it would be "clearly improper" to say that the mineral interests were "abandoned" while subject to an active oil and gas lease. We disagree.

{¶ 77} Typically, an oil and gas lease, like the lease in which petitioners assert an interest here, contains a primary fixed term and a secondary term that extends the lessee's rights under the lease only on certain conditions described in the lease. If the conditions of the secondary term are not met, " 'the lease terminates by the express terms of the contract * * * and by operation of law and revests the leased estate in the lessor.' " *Tisdale v. Walla*, 11th Dist. Ashtabula No. 94-A-0008, 1994 WL 738744, *3 (Dec. 23, 1994), quoting *Am. Energy Servs., Inc. v. Lekan,* 75 Ohio App.3d 205, 212, 598 N.E.2d 1315 (5th Dist.1992).

{¶ 78} Additionally, the lease may describe any number of events that would either extend the term of the lease or cause the lease to expire. A lease might provide that it will terminate by the lessee's decision to surrender it. *Kramer v. PAC Drilling,* 197 Ohio App.3d at 559, 968 N.E.2d 64. Or the lease may cease by the permanent abandonment, lack of production, or the exhaustion of oil and gas resources on the property. *See Tisdale* at *3; *Harris*, 57 Ohio St. at 130-131, 48 N.E. 502; *Moore v. Indian Camp Coal Co.,* 75 Ohio St. 493, 499, 80 N.E. 6 (1907).

{¶ 79} For example, in *Harris*, the oil and gas lease at issue had a primary term of five years "and as much longer as oil and gas are found in paying quantities." *Harris* at 128. Though the five-year primary period had expired, the

lease was still in force and would continue until the required actual production ceased. *Id*. at 130.

> When that period shall arrive, whether caused by the exhausting of the oil and gas, or by the permanent abandonment of production, the lease will cease, and the whole estate in the premises will become the property of the owner of the fee, not by forfeiture, but by virtue of the terms of the lease.

*Id.* at 130-131.

{¶ 80} As these cases demonstrate, mere inaction by the lessee can result in the lease's expiration. Although the terms of the lease might describe the events by which expiration *could* occur, the lease itself does not provide notice of the *actual* occurrence of the lease expiration and the reversion of rights in the lessor. And either party to a lease might abandon that lease during its term without any record notice if, for example, the mineral resources are not accessible, not productive, or not profitable. A title searcher looking at the lease will not be able to tell that the parties' inaction has triggered the expiration or termination of the lease. In fact, the lease could expire in any number of ways that would not be discernible from a review of the lease itself.

{¶ 81} Thus, the terms of a recorded oil and gas lease cannot provide sufficient notice of activity under the lease to toll the 20-year clock during the life of the lease, nor can the expiration of such a lease be considered a "title transaction that has been recorded or filed" within the meaning of R.C. 5301.56(B)(3)(a) when the expiration is unrecorded. Accordingly, we conclude that the unrecorded expiration of an oil and gas lease does not constitute a saving event under R.C. 5301.56(B)(3)(a) that would restart the 20-year clock.

**{¶ 82}** This conclusion does not unfairly prejudice a lessor or mineral-rights holder. Any party to an oil and gas lease (or other mineral-rights holder) can employ other saving devices to restart the 20-year clock. These saving devices encourage the mineral-rights holder to pay attention to his or her mineral rights. If a lessee fails to record a release upon expiration, an attentive mineral-rights holder can act to ensure that a saving event preserves the mineral interest. In other words, a lease is not the exclusive mechanism to preserve mineral interests. A holder can take other steps to ensure that the interest is not deemed abandoned. For example, actual production or withdrawal of minerals during the term of the lease could restart the 20-year clock under R.C. 5301.56(B)(3)(b). Even during periods of inactivity, the mineral-rights holder may protect his or her interest by simply filing a claim that complies with R.C. 5301.56(C). R.C. 5301.56(B)(3)(e). The mineral interest can be preserved indefinitely from being deemed abandoned through successive filings of such claims. R.C. 5301.56(D)(1).[9]

**{¶ 83}** Construing the mere expiration of a lease as constituting a saving event would not contribute to the clarity of the record of title that the Dormant Mineral Act seeks. Likewise, allowing the mere existence of an oil and gas lease to toll the 20-year time period for abandonment during its life does not further the purpose of the statute. Thus, we hold that the unrecorded expiration of an oil and gas lease and the accompanying reversion of rights to the lessor is not a title transaction that restarts the 20-year clock under the Dormant Mineral Act.

---

[9] Pursuant to R.C. 5301.56(D)(1):

> A mineral interest may be preserved indefinitely from being deemed abandoned under division (B) of this section by the occurrence of any of the circumstances described in division (B)(3) of this section, including, but not limited to, successive filings of claims to preserve mineral interests under division (C) of this section.

CONCLUSION

**{¶ 84}** We answer the first certified state-law question in the affirmative and the second in the negative. A recorded oil and gas lease is a title transaction under R.C. 5301.56(B)(3)(a). But the unrecorded expiration of that lease and the accompanying reversion of rights to the lessor granted by the lease is not a title transaction that restarts the 20-year clock under the Dormant Mineral Act.

So answered.

LANZINGER, FRENCH, and O'NEILL, JJ., concur.

PFEIFER and O'DONNELL, JJ., concur in part and dissent in part.

KENNEDY, J., concurs in the answers to the certified questions and concurs in part.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

**{¶ 85}** The federal court certified two questions to this court. I dissent from the majority's response to the first question; I would hold that the recorded lease of a subsurface mineral estate is not a title transaction under R.C. 5301.56(B)(3)(a). An answer to the second question becomes necessary only because of the majority's response to the first question. Still, I concur in the majority's response to the second question, wherein this court holds that the expiration of a recorded lease and the reversion of rights under that lease do not constitute a title transaction that restarts the 20-year forfeiture clock under R.C. 5301.56(B)(3)(a). But back to that first question.

**{¶ 86}** We are asked whether the execution of a lease is one of the six saving events under R.C. 5301.56(B)(3), specifically, whether the recording of a lease constitutes a "title transaction" under R.C. 5301.56(B)(3)(a). Under that provision, the 20-year dormancy clock under Ohio's Dormant Mineral Act ("ODMA") restarts when, within the past 20 years, "[t]he mineral interest has

28

been the subject of a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located." R.C. 5301.47(F) defines what a title transaction is:

> "Title transaction" means any transaction affecting title to any interest in land, including title by will or descent, title by tax deed, or by trustee's, assignee's, guardian's, executor's, administrator's, or sheriff's deed, or decree of any court, as well as warranty deed, quit claim deed, or mortgage.

The ultimate question regarding the saving event under R.C. 5301.56(B)(3)(a), then, is whether the mineral interest has been the subject of any transaction affecting its title.

{¶ 87} The starting point for analyzing whether the recording of a lease is a title transaction under the ODMA is the plain language of the statute defining "title transaction." That definition names certain types of title transactions but does not include leases. Nor does the definition of title transaction include anything like leases. Granted, R.C. 5301.47(F) does not state that its list of transactions that affect title is exhaustive, but every transaction mentioned in the statute either actually or potentially affects an ownership interest in the property. Almost all of the listed transactions in the statute specifically relate to a transfer of title by a deed or similar vehicle, and thus, a transfer of ownership. The statute also mentions a transaction by "decree of court," e.g., by a quiet-title action that determines who holds title to the property. A mortgage, also listed in the statute, does not affect the present ownership of the property, but creates in the mortgage holder, upon the default of the borrower, the ability to exercise rights of ownership. Since all of the examples listed in R.C. 5301.47(F) bear on the

ownership of property, it follows that a transaction like a lease, which does not alter who owns the property at issue, falls outside the scope of the statute.

{¶ 88} The lack of a reference to leases is significant given the legislative history of the ODMA. When it was first introduced as legislation in Ohio, the ODMA specifically included a lease of property as a saving event. Under the proposed version of R.C. 5301.56(B)(2)(a), a mineral right would not be considered dormant if, in the preceding 20 years "the interest has been conveyed, leased, transferred, or mortgaged by an instrument filed or recorded in the recorder's office of the county in which the lands are located." S.B. No. 223, as introduced in the 117th General Assembly. This was consistent with the Uniform Dormant Mineral Interests Act ("UDMIA"), which the National Conference of Commissioners on Uniform State Laws approved and recommended in August 1986. Under Section 4(b)(3) of the UDMIA, one of the listed saving events was "[r]ecordation of an instrument that creates, reserves, or otherwise evidences a claim to or the continued existence of the mineral interest, including an instrument that transfers, leases, or divides the interest." But that clear declaration in the UDMIA and in the introduced version of the ODMA is absent from the ODMA that was ultimately enacted into law.

{¶ 89} The question of whether a lease is a title transaction was a known issue without a uniform answer among the states at the time the ODMA was being considered. The Prefatory Note of the UDMIA states, "A lease permits the lessee to enter the land and remove minerals for a specified period of time; whether a lease creates a separate title to the real estate varies from state to state." As the majority relates, "[t]he oil and gas lease is central to the oil and gas industry," majority opinion at ¶ 16, and "whether an oil and gas lease would meet the definition of a title transaction" was "[a] question, at least in the minds of the land-title insurance industry" at the time of the enactment of the ODMA in 1989. Majority opinion at ¶ 28. The General Assembly answered the question: leases,

the central documents of the oil and gas industry, are not mentioned as saving events. If the General Assembly intended to include leases, why would it delete the language from the original bill that expressly included leases? And why would it bypass the inclusion of leases recommended in the UDMIA, of which it surely was aware? If the General Assembly intended leases to operate as saving events, why wouldn't it simply say so? Other states have. Michigan explicitly includes a lease as a saving event. Mich.Comp.Laws Ann. 554.291(1) ("Any interest in oil or gas in any land owned by any person other than the owner of the surface, which has not been sold, leased, mortgaged, or transferred * * * for a period of 20 years shall * * * be deemed abandoned * * *"). Oklahoma explicitly includes a lease as a title transaction. 16 Okla.Stat.Ann. 78(f) (" 'Title transaction' means any transaction affecting title to any interest in land, including title by will or descent, title by tax deed, mineral deed, lease or reservation * * *).

{¶ 90} This is not to say that leases have no role in the ODMA. A saving event occurs when "[t]here has been actual production or withdrawal of minerals by the holder * * * from lands covered by a lease to which the mineral interest is subject * * *." Simply put, a lease plays a part in a saving event when production begins pursuant to the lease's terms, but not while the minerals to which it is attached remain unexploited. This is consistent with the aim of the ODMA to encourage the use of Ohio's natural resources.

{¶ 91} Since the briefing and oral argument in this case, the General Assembly has amended R.C. 5301.09. That statute requires the recording of leases and licenses "by which any right is granted to operate or to sink or drill wells thereon for natural gas and petroleum or either." Effective March 23, 2015, the General Assembly amended the statute by adding the introductory phrase, "[i]n recognition that such leases and licenses create an interest in real estate." But the fact that they are interests in real estate does not mean that leases and licenses affect the *title* to a mineral interest. The ownership of the mineral interest

remains with the lessor. The lessor retains the power to convey the mineral interest, subject to the lease. "[A]n oil lease is an encumbrance." *Karas v. Brogan*, 55 Ohio St.2d 128, 129, 378 N.E.2d 470 (1978). An encumbrance does not affect the title of property held in fee simple. " 'A "fee simple" may be absolute, conditional, or subject to defeasance, but the mere existence of encumbrances does not affect its status as fee simple.' " *HIN, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 138 Ohio St.3d 223, 2014-Ohio-523, 5 N.E.3d 637, ¶ 23, quoting *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, ¶ 23, fn. 4. The presence of a lease may affect the value of the property or may affect the owner's use of the property, but it does not affect the owner's title to the property.

{¶ 92} The question presented in this case is whether the recordation of a lease is a saving event under R.C. 5301.56(B)(3)(a). We are interpreting a statute. We know that the recording of a lease is not specifically mentioned as a saving event. We know that the recording of a lease is not specifically mentioned as a title transaction. We know that a lease is unlike the transactions that are mentioned in the definition of a title transaction. We know that leases are saving events in the model statute and were also in the ODMA as first introduced, but they were not in the ODMA as enacted. We know that where leases are mentioned in the ODMA, production pursuant to the lease is required to constitute a saving event. Knowing all this, I cannot conclude that the recording of a lease is a saving event under R.C. 5301.56(B)(3)(a).

O'DONNELL, J., concurs in the foregoing opinion.

_____

**KENNEDY, J., concurring in the answers to the certified questions and concurring in the opinion in part.**

{¶ 93} Respectfully, while I concur with the answers to both questions, I concur with the analysis only in part. With regard to the second certified

question, I agree that the expiration of an unrecorded oil and gas lease and the reversion to the lessor is not a title transaction under R.C. 5301.56(B)(3)(a) of the Ohio Dormant Minerals Act ("ODMA").

{¶ 94} As to the first certified question—whether a recorded oil and gas lease is a "title transaction" under the ODMA—I agree with the majority that the answer is "yes," but I do not agree with the analysis. I reject the dissenting view that the failure of the General Assembly to enact the initial proposed ODMA language, which specifically included leases, manifests the legislature's intention not to include leases as a saving event. *See* S.B. No. 223, as introduced in the 117th General Assembly. In my view the General Assembly's replacement of the four specific transactions "conveyed, leased, transferred, or mortgaged" as they appeared in the bill as introduced with the more general term "title transaction" as finally enacted indicates that the General Assembly intended to broaden the types of transactions that may serve as a saving event.

{¶ 95} However, because the majority answers the first certified question relying, in part, on a determination of what interest in land a traditional oil and gas lease creates, I concur in the answer only.

{¶ 96} The petitioner North American Coal Royalty Company and amicus curiae the Ohio Oil and Gas Association argue that in order to answer the first question, it is not necessary to address whether an oil and gas lease creates a particular property interest, and to do so with this record and lack of briefing could have unintended negative consequences in the oil and gas industry. Because answering the narrow certified question requires only a consideration of the statutory provisions within the context of the Revised Code and the statutory scheme, I reject the majority's analysis and write separately.

**{¶ 97}** The federal court's first certified question is a narrow one: "Is the recorded lease of a severed subsurface mineral estate a title transaction under the ODMA, Ohio Revised Code § 5301.56(B)(3)(a)?"

**{¶ 98}** To answer this question requires an examination of the language of the statute and the intention of the General Assembly. In enacting our laws the legislature is presumed to know the meaning of words and to have used the words of the statute advisedly and to have expressed legislative intent by the use of words found in the statute. *Wachendorf v. Shaver*, 149 Ohio St. 231, 236, 78 N.E.2d 370 (1948), citing *Shugars v. Williams*, 50 Ohio St. 297, 34 N.E. 248 (1893). In keeping with the tenets of statutory construction, nothing may be read into the statute that is not within the manifest intention of the legislature as gathered from the statute itself. Id.

**{¶ 99}** The ODMA is part of the Marketable Title Act ("MTA"), R.C. 5301.47 et seq. While the ODMA does not define "title transaction," the MTA defines that term as:

> [A]ny transaction affecting title to any interest in land, including title by will or descent, title by tax deed, or by trustee's, assignee's, guardian's, executor's, administrator's, or sheriff's deed, or decree of any court, as well as warranty deed, quit claim deed, or mortgage.

R.C. 5301.47(F).

**{¶ 100}** R.C. 5301.47(F) has not been amended since the MTA was enacted in 1961. Therefore, the definition of the term "title transaction" and the intention of the General Assembly was unchanged.

34

{¶ 101} The concurrence in part and dissent in part holds and amicus curiae state of Ohio argues that in order for a transaction to fall within the meaning of "title transaction," the transaction must shift ownership, i.e., to be a title transaction, the transaction must dispossess the owner of his legal right to own the property. I disagree.

{¶ 102} The nonexhaustive list of examples of "title transactions" listed in R.C. 5301.47(F) includes "decree of any court" and "mortgage." A close examination of these transactions demonstrates that the General Assembly intended that "affecting title" is not synonymous with shifting or impairing ownership.

{¶ 103} In *Blakely v. Capitan*, the court held that a 1968 court order determining that use restrictions in a deed were valid and enforceable was a title transaction within the meaning of the MTA. 34 Ohio App.3d 46, 48, 516 N.E.2d 248 (11th Dist.1986). Similarly, a mortgage by itself does not affect ownership. Absent foreclosure and sale of the property or a mortgagee extinguishing the mortgagor's right to redeem, the owner remains the owner. "In Ohio, a mortgage is merely a security for a debt, and the legal and equitable title to the property remains in the mortgagor until the mortgage is foreclosed and a sale consummated, or until a mortgagee otherwise extinguishes the right of the mortgagor to redeem." *Fannie Mae v. Winding*, 12th Dist. Butler No. CA2013-09-179, 2014-Ohio-1698, 10 N.E.3d 799, ¶ 21, citing *Stand Energy Corp. v. Epler*, 163 Ohio App.3d 354, 2005-Ohio-4820, 837 N.E.2d 1229, ¶ 13 (10th Dist.); *Kirshner v. Fannie Mae*, 6th Dist. Lucas No. L-11-1027, 2012-Ohio-286, 969 N.E.2d 340, ¶ 16–17. *See also Levin v. Carney*, 161 Ohio St. 513, 520, 120 N.E.2d 92 (1954) (the legal and equitable title to mortgaged real estate remains in the mortgagor).

{¶ 104} There is nothing in R.C. 5301.47(F) that suggests that "affecting" is defined by other than its plain meaning, which is merely "to produce an effect on; to influence in some way." *Black's Law Dictionary* 68 (10th Ed.2014). And the operative word is "title," which has a broader meaning than "ownership." *See id*. at 1712 (title can also mean "[l]egal evidence of a person's ownership rights in property").

{¶ 105} Therefore, in defining "title transaction" in R.C. 5301.47(F), the General Assembly did not intend "affecting title" to mean affecting ownership in the sense that the transaction must divest the property owner of title and/or ownership to the property.

{¶ 106} I agree with the majority that using the word "any" to modify "transaction" and "interest in land" in R.C. 5301.47(F) indicates a broad construction, but the real focal point of the language is the phrase "affecting title." To discern its meaning we need look no further than the intention of the General Assembly and the context within the statutory scheme. As set forth below, I would hold that any transaction that asserts a claim or interest in any land and that must be recorded "affect[s] title."

{¶ 107} The General Assembly enacted the MTA to simplify and facilitate land title transactions by permitting "persons to rely on a record chain of title as described in [R.C.] 5301.48 [i.e., an unbroken chain of title for 40 years or more], subject only to such limitations as appear in [R.C.] 5301.49 * * *." R.C. 5301.55. This "marketable record title" is central to facilitating land title transactions, along with the "root of title." R.C. 5301.47(A) and (E).

{¶ 108} As defined in the MTA, "marketable title record" is "a title of record, as indicated in [R.C. 5301.48], which operates to extinguish such interests and claims, existing prior to the effective date of the root of title [as provided in R.C. 5301.50]." R.C. 5301.47(A). "Root of title" is defined as the "conveyance

or other title transaction" in the chain of title that creates the interest being claimed.  R.C. 5301.47(E).

{¶ 109} "[M]arketable title acts are intended to operate in conjunction with, rather than as a substitute for, the recording statutes."  *Spring Lakes, Ltd. v. O.F.M. Co.*, 12 Ohio St.3d 333, 338, 467 N.E.2d 537 (1984) (Holmes, J., concurring).  "[T]he purpose of the recording statutes is to give notice to all persons subsequently acquiring rights or interests in the land."  *Marshall v. Ebling*, 70 Ohio App. 145, 155, 45 N.E.2d 318 (7th Dist.1942).  As noted by the Supreme Court of Rhode Island, "[t]he general purpose of land-recording statutes is to provide a public record of transactions *affecting title* to land."  (Emphasis added.) *In re Barnacle*, 623 A.2d 445, 447 (R.I.1993).

{¶ 110} "It is a well-settled rule of statutory interpretation that statutory provisions be construed together and the Revised Code be read as an interrelated body of law."  *State v. Moaning*, 76 Ohio St.3d 126, 128, 666 N.E.2d 1115 (1996).  Where statutes address the same subject matter, "[they] must be construed in pari materia and harmonized so as to give full effect to the statutes." *State ex rel. Westlake v. Corrigan*, 112 Ohio St.3d 463, 2007-Ohio-375, 860 N.E.2d 1017, ¶ 20.

{¶ 111} Because a marketable title requires an easily traceable chain of recorded title consideration of the recording statutes is necessary.

{¶ 112} All the examples in the nonexhaustive list of transactions in R.C. 5301.47(F) have a companion recording statute.  After issuance of a certificate of transfer by the probate court, title to real property passing by will or descent is recorded pursuant to R.C. 2113.62.  Mortgages are to be recorded in a manner consistent with R.C. 5301.23.  In the case of a judgment or decree of court, R.C. 5309.53 provides that no such judgment or decree "shall be a lien upon or affect registered land, or any interest therein" unless it is filed in the office of the county

recorder. All the remaining illustrative examples refer to deeds, which are required to be recorded in accord with R.C. 5301.25(A).

{¶ 113} "All deeds, land contracts * * * and instruments of writing * * * for the conveyance or encumbrance of lands" are required to be recorded in the office of the county recorder in which the land is situated. R.C. 5301.25(A). Separate from that provision, R.C. 5301.09 requires that "all leases, licenses, and assignments thereof, * * * given or made concerning lands * * * by which any right is granted to operate or to sink or drill wells thereon" for oil and/or gas are required to be recorded in the lease record in the office of the county recorder in which the land is situated.

{¶ 114} A cursory comparison of R.C. 5301.25 (referring to instruments for "the conveyance or encumbrance of lands") and 5301.09 (referring to oil and gas leases as merely "given or made concerning lands") could lead to the conclusion that the milder, less direct language of the latter reflects the General Assembly's intent to diminish the legal effect of an oil and gas lease on an interest in land. However, such a conclusion would ignore the interplay of the recording statutes and defy the rules of statutory construction applicable to general versus special provisions.

{¶ 115} In considering an earlier, almost identical version of R.C. 5301.09, this court held that the recording provision for an oil and gas lease was "a special statutory provision" that operated as an exception to the general recording statute, which would otherwise include the type of transaction contained in the special provision. *Northwestern Ohio Natural Gas Co. v. Tiffin*, 59 Ohio St. 420, 441, 54 N.E. 77 (1899), citing R.S. 4112a (predecessor to R.C. 5301.09). Therefore, but for the special recording provision, an oil and gas lease would be recorded in accord with R.C. 5301.25.

{¶ 116} Harmonizing the provisions of the MTA with the recording statutes contained in R.C. Chapters 2113, 5301, and 5309 reveals a commonality

with the examples of title transactions listed in R.C. 5301.47(F). The examples are claims or interests against, or in, land that must be recorded pursuant to the Revised Code. Therefore, construing the recording statutes and R.C. 5301.47(F) in pari materia, I would hold that any transaction that must be recorded must be a "title transaction" within R.C. 5301.47(F) because the purpose of a recording requirement is to "provide a public record of transactions *affecting title* to land." (Emphasis added.) *In re Barnacle*, 623 A.2d at 447.

{¶ 117} The January 28, 2009 oil and gas lease herein bears the stamp of the Harrison County recorder stating that it was filed for record in that office. Therefore, I agree with the majority that the answer to the first certified question is affirmative, but not with the majority's analysis: a recorded oil and gas lease is a title transaction pursuant to R.C. 5301.56(B)(3)(a). I also agree with the negative answer to the second certified question—that the expiration of an unrecorded oil and gas lease and the reversion to the lessor is not. Accordingly, I respectfully concur in the answers but concur with the opinion only in part.

_____

Jones Day, Jeffery D. Ubersax, and Dean C. Williams; and Thornburg & Bean and Charles H. Bean, for petitioner North American Coal Royalty Company.

Roetzel & Andress, L.P.A., Robert B. Graziano, and Michael R. Traven; and Reed Smith, L.L.P., Nicolle R. Snyder Bagnell, and Kevin C. Abbott, for petitioners Chesapeake Exploration, L.L.C., CHK Utica, L.L.C., Larchmont Resources, L.L.C., Dale Pennsylvania Royalty, L.P., Dale Property Services Penn, L.P., and Total E&P USA, Inc.

Tzangas, Plakas, Mannos, Ltd., Gary A. Corroto, Lee E. Plakas, and Joshua E. O'Farrell, for respondents.

Vorys, Sater, Seymour & Pease, L.L.P., and John K. Keller, in support of neither side for amicus curiae Ohio Oil and Gas Association.

Michael DeWine, Attorney General, Eric E. Murphy, Solicitor General, and Samuel C. Peterson, Deputy Solicitor, in support of respondents for amicus curiae the state of Ohio.

Ice Miller, L.L.P., Matthew L. Fornshell, and Nicole R. Woods, in support of petitioners for amicus curiae Bedway Land & Minerals Company.

_____