*523 Kennedy, J.,
concurring in judgment only in the answer to the first certified question and concurring in the answer to the second certified question.
{¶ 43} I fully agree with the majority’s analysis and resolution of the second certified question that a delay-rental payment is not a title transaction. I also agree with the majority’s conclusion that the 1989 Dormant Mineral Act (“DMA”), former R.C. 5301.56, Am.Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981, 985-987 (“S.B. 223”), was not self-executing and that a severed mineral interest cannot revert to the surface owner absent judicial action. Therefore, I agree with the majority that the answer to the first certified question is that the 2006 version of the DMA applies to all claims asserted after June 30, 2006. I write separately, however, because in my view, the 1989 DMA was ambiguous regarding what it required for a severed mineral interest to be “abandoned.”
{¶ 44} The General Assembly enacted the Marketable Title Act (“MTA”) to “extinguish” interests and claims in land that existed prior to the root title. See R.C. 5301.47(A) and 5301.50. However, as demonstrated by our decision in Heifner v. Bradford, 4 Ohio St.3d 49, 446 N.E.2d 440 (1983), the MTA was unsuccessful in extinguishing all dormant severed mineral interests. After our decision in Heifner, the General Assembly enacted the DMA.
{¶ 45} In drafting the 1989 version of the DMA, the legislature used the term “abandoned.” As explained below, when the legislature was considering the bill, the term “abandoned” had a particular meaning under Ohio common law—to have property declared abandoned required evidence of both nonuse and an intent of the owner to abandon the property. However, the 1989 DMA also provided that severed mineral estates were “abandoned” if certain statutory elements were satisfied, such as the passage of time without the occurrence of a saving event. Because of this inconsistency, I find that the 1989 version of the DMA was ambiguous.
{¶ 46} For the reasons that follow, I would interpret the phrase “deemed abandoned and vested” as requiring evidence that none of the statutory elements of the 1989 DMA, former R.C. 5301.56(B)(1)(a) through (c), were satisfied and that the holder of the severed mineral interest intended to abandon them.

I. Statutory Construction

{¶ 47} “The ultimate inquiry in the interpretation of statutes is to ascertain the legislative intent.” Caldwell v. State, 115 Ohio St. 458, 466, 154 N.E. 792 (1926). One of the cardinal rules of statutory construction is that we must first examine the language of the statute itself. Provident Bank v. Wood, 36 Ohio St.2d 101, 105, 304 N.E.2d 378 (1973). “ ‘[I]f the words [are] free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the lawmaking *524 body, there is no occasion to resort to other means of interpretation.’ ” Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 12, quoting Slingluff v. Weaver, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus.
{¶ 48} “Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.” R.C. 1.42. We presume that the legislature “knows the existing condition of the law, whether common law * * * or statute law.” Wachendorf v. Shaver, 149 Ohio St. 231, 248, 78 N.E.2d 370 (1948), citing State ex rel. Morris v. Sullivan, 81 Ohio St. 79, 90 N.E. 146 (1909); Norris v. State, 25 Ohio St. 217 (1874); Johnson v. Johnson, 31 Ohio St. 131 (1876); and S. Sur. Co. v. Std. Slag Co., 117 Ohio St. 512, 159 N.E. 559 (1927). “ ‘[W]here a statute uses a word which has a definite meaning at common law, it will be presumed to be used in that sense and not in the loose popular sense.’ ” Thompson v. Community Mental Health Ctrs. of Warren Cty., Inc., 71 Ohio St.3d 194, 195, 642 N.E.2d 1102 (1994), quoting Richardson v. Doe, 176 Ohio St. 370, 372-373, 199 N.E.2d 878 (1964).
{¶ 49} “ ‘[T]he General Assembly is not presumed to do a vain or useless thing, and * * * when language is inserted in a statute it is inserted to accomplish some definite purpose.’ ” State v. Wilson, 77 Ohio St.3d 334, 336, 673 N.E.2d 1347 (1997), quoting State ex rel. Cleveland Elec. Illum. Co. v. Euclid, 169 Ohio St. 476, 479, 159 N.E.2d 756 (1959). When reviewing a statute, “ ‘we should not pick out one sentence and disassociate it from the context.’ ” MacDonald v. Bernard, 1 Ohio St.3d 85, 89, 438 N.E.2d 410 (1982), quoting Black-Clawson Co. v. Evatt, 139 Ohio St. 100, 104, 38 N.E.2d 403 (1941). We must look at the four corners of the enactment to determine the intent of the legislature. Id. If a statute is ambiguous, then the court may consider “other matters” in determining the intention of the legislature. R.C. 1.49.

II. 1989 Version of the DMA

{¶ 50} The 1989 version of the DMA stated: “Any mineral interest held by any person, other than the owner of the surface of the lands subject to the interest, shall be deemed abandoned and vested in the owner of the surface,” unless (a) the mineral interest is related to coal, (b) the interest is held by the United States, the state of Ohio, or another political body described in the statute, or (c) one of the listed saving events has occurred within the preceding 20 years. Former R.C. 5301.56(B)(1), 142 Ohio Laws, Part I, at 985-987.

III. The Term “Abandoned” in the 1989 DMA

A. The Term “Abandoned” Has a Particular Meaning in Property Law
{¶ 51} “In Ohio, abandoned property ‘is property over which the owner has relinquished all right, title, claim and possession with the intention of not *525 reclaiming it or resuming its ownership, possession or enjoyment.’ ” In re Panel Town of Dayton, Inc., 338 B.R. 764, 774 (S.D.Ohio 2006), quoting Doughman v. Long, 42 Ohio App.3d 17, 21, 536 N.E.2d 394 (12th Dist.1987). Abandonment is “the intentional relinquishment of a known right.” Hodges v. Ettinger, 127 Ohio St. 460, 463, 189 N.E. 113 (1934). Proof of abandonment requires both “ ‘evidence of an intention to abandon as well as of acts by which the intention is put into effect.’ ” (Emphasis sic.) Wyatt v. Ohio Dept. of Transp., 87 Ohio App.3d 1, 5, 621 N.E.2d 822 (11th Dist.1993), quoting W. Park Shopping Ctr. v. Masheter, 6 Ohio St.2d 142, 144, 216 N.E.2d 761 (1966).
{¶ 52} While “lapse of time or other circumstances [may be] indicative of an intention [to] abandon,” Junction RR. Co. v. Ruggles, 7 Ohio St. 1, 10-11 (1857), “[n]on-use of the property, in and by itself, does not constitute abandonment,” Mead Corp. v. Huntington Natl. Bank, 4th Dist. Jackson No. 472, 1983 WL 3170, *2 (Apr. 25, 1983); see also Farnsworth v. Burkhart, 2014-Ohio-4184, 21 N.E .3d 577, ¶ 73 (7th Dist.). “ ‘To constitute abandonment, nonuse of property must be coupled with intention to relinquish or abandon it.’ ” Wapakoneta Bd. of Edn. v. Unknown Heirs of Aughinbaugh, 71 Ohio Law Abs. 1, 14, 128 N.E.2d 534 (C.P.1954), citing 1 Ohio Jurisprudence 2d, Abandonment, Section 9, at 8-9 (1953).
B. The Term “Abandoned” and the MTA
{¶ 53} The lead opinion provides a succinct history of the MTA. From its enactment in 1961 until it was amended to incorporate the DMA, the MTA did not use the term “abandoned.” Instead, the MTA used the term “extinguish” for the purpose of making property marketable. R.C. 5301.47(A) (this provision has not changed since it was enacted). The term “abandoned” first appears in the statutory scheme in 1989, when the MTA was amended to enact the DMA.
{¶ 54} The 1989 DMA provided, among other things, that a mineral interest “shall be deemed abandoned and vested in the owner of the surface” if a saving event has not occurred within the preceding 20 years. Former R.C. 5301.56(B)(l)(c)(i) through (vi), 142 Ohio Laws, Part I, at 986-987. Each of the saving events describes a use of the minerals or an action with regard to the interest in the minerals. Id.
{¶ 55} The concurring and dissenting opinion concludes that it is readily clear from reading the words of the 1989 DMA that the statute was self-executing. However, R.C. 1.42 requires that we construe words that have attained “particular meaning” accordingly.
{¶ 56} Since the General Assembly did not define the word “abandoned” in its 1989 enactment of the DMA, it must be presumed “to [have] know[n] the meaning of words, to have used the words of a statute advisedly and to have expressed *526 legislative intent by the use of the words found in the statute.” Wachendorf, 149 Ohio St. at 237, 78 N.E.2d 370.
{¶ 57} Because the term “abandoned” had a particular meaning in Ohio property common law at the time the DMA was enacted, we must presume that the General Assembly “used [it] in that sense,” Thompson, 71 Ohio St.3d at 195, 642 N.E.2d 1102; see also In re Panel Town of Dayton, 338 B.R. at 774, “ ‘to accomplish some definite purpose,’ ” Wilson, 77 Ohio St.3d at 336, 673 N.E.2d 1347, quoting State ex rel. Cleveland Elec. Illum. Co., 169 Ohio St. at 479, 159 N.E.2d 756.
C. Former R.C. 5301.56(B)(1) of the 1989 DMA Is Ambiguous
{¶ 58} As explained above, the term “abandoned” had a particular meaning in Ohio property common law when the DMA was enacted. It required both an action and an intention to abandon. However, the 1989 DMA required only nonuse for a mineral interest to be “deemed abandoned and vested in the owner of the surface.” Because the 1989 DMA is internally inconsistent, it is ambiguous. And when a statute is ambiguous, a court may consider, “among other matters,” the circumstances of the enactment, available legislative history, if any, and the consequences of a particular construction to determine the General Assembly’s intent. R.C. 1.49(B), (C), and (E).

TV. Intention of the General Assembly

A. R.C. 1.49(B): Circumstances of Enactment
{¶ 59} In a case of first impression, this court decided competing claims of ownership to oil and gas rights under the MTA in Heifner, 4 Ohio St.3d 49, 446 N.E.2d 440. In Heifner, the appellants claimed a fractional ownership interest in. the oil and gas rights in a tract of land in Muskingum County. Their interest was traceable to a 1916 deed that reserved the oil and gas rights to the grantor, Elvira Sprague. Sprague died in 1931, and her reserved rights were bequeathed to her two daughters. An authenticated copy of the will was filed in Muskingum County in 1957, and in accordance with the terms of the will, an affidavit of transfer was filed evidencing the transfer of the oil and gas rights to Sprague’s two daughters. But by that time, the two daughters had died intestate, and their respective interests had been divided among their children, and affidavits of transfer evidencing these conveyances were also filed in 1957. The appellees were the surface owners of the same tract, whose root of title was a 1936 conveyance that failed to mention that the oil and gas rights had been reserved.
{¶ 60} We set forth the issue as follows: “whether appellees, who have an unbroken chain of title of record of forty years or more, have a marketable record title even though appellants’ competing interest arose from an independent chain *527 of title recorded during the forty-year period subsequent to appellees’ root of title.” Id. at 50. In concluding that the appellants’ interest was not extinguished by operation of the MTA, we held that the MTA, based on the Model Act, confers a marketable record title on one who has an unbroken chain of title for 40 years or more, subject to any interest arising out of a “title transaction” recorded after the root of title that started the chain. This court concluded that the affidavits of transfer in 1957 were “title transactions” that broke the chain of title of the appellees, even though those transactions arose from an independent chain of title. Therefore, the interest conveyed to the appellants in 1957 was not extinguished by operation of the MTA.
{¶ 61} Our interpretation of the MTA in Heifner was “[t]he impetus for the creation of the DMA.” Wendt v. Dickerson, 5th Dist. Tuscarawas No. 2014 AP 01 0003, 2014-Ohio-4615, 2014 WL 5306667, ¶ 21; see also Stewart, When the Shale Gale Hit Ohio: The Failures of the Dormant Mineral Act, Its Heroic Interpretations, and Grave Choices Facing the Supreme Court, 43 Cap.U.L.Rev. 435, 440 (2015), fn. 46 CHeifner led to the 1989 version of the DMA because “it became obvious that the [MTA] would not be an effective mechanism for clarifying or terminating title to ancient mineral claims”).
B. R.C. 1.49(C): Legislative History
{¶ 62} To discern the legislature’s intent in cases of ambiguous statutory language, we have considered legislative proceedings and debates. State ex. rel. Shafer v. Ohio Turnpike Comm., 159 Ohio St. 581, 588, 113 N.E.2d 14 (1953), citing Caldwell, 115 Ohio St. at 467, 154 N.E. 792; Toledo v. Pub. Util. Comm., 135 Ohio St. 57, 19 N.E.2d 162 (1939). The guiding principle for use of these materials is that they should be “helpful and objective” in assisting us in determining the intention of the legislature. Meeks v. Papadopulos, 62 Ohio St.2d 187, 191, 404 N.E.2d 159 (1980).
{¶ 63} Testifying in support of the 1989 DMA was William J. Taylor, a lawyer whose firm represented the appellants before this court in Heifner, 4 Ohio St.3d 49, 446 N.E.2d 440. He explained the history of the MTA and said that the court’s holding in Heifner demonstrated the ineffectiveness of the MTA in “eliminating” dormant severed mineral estates. Testimony in Support of S.B. 223, House Select Committee on Civil Justice, June 28,1988.
{¶ 64} In his view, “[t]he proposed bill * * * contained] the essential elements recommended by the National Conference of Commissioners on Uniform State Laws [‘NCCUSL’] at its conference in Boston in August, 1986.” Id. at 3. When he addressed the committee, Taylor provided its members with a copy of the Uniform Dormant Mineral Interests Act (“UDMIA”), which was drafted by the NCCUSL and included a prefatory note and comments.
*528 {¶ 65} The UDMIA, with the prefatory, note and comments, is available at http://www.uniformlaws.org/shared/docs/dormant%20mineral% 20interests/ud-mia_final_86.pdf (accessed July 12, 2016). The prefatory note to the UDMIA provided an overview of the various ways in which mineral interests are subject to a possessory interest and then outlined the legal difficulties in resolving dormant mineral interests. It then delineated a series of approaches to combat those problems.
{¶ 66} The prefatory note to the UDMIA stated:
The common law concept of abandonment of mineral interests provides useful relief in some situations. As a general rule, severed mineral interests that are regarded as separate possessory estates are not subject to abandonment. But less than fee interests in the nature of a lease or profit may be subject to abandonment. In some jurisdictions the scope of the abandonment remedy has been broadened to extend to oil and gas rights on the basis that these minerals, being fugacious, are owned in the form of incorporeal hereditament, and hence are subject to abandonment.
The abandonment remedy is limited both in scope and by practical proof problems. Abandonment requires a difficult showing of intent to abandon; nonuse of the mineral interest alone is not sufficient evidence of intent to abandon.
(Emphasis added.) Id at 2.
{¶ 67} Thereafter, the prefatory note stated that some jurisdictions had passed laws permitting nonuse of a mineral interest for a specified term to terminate mineral rights. It went on to explain: “The nonuse scheme has advantages and disadvantages. Its major attraction is that it enables extinguishment of dormant interests solely on the basis of nonuse; proof of intent to abandon is unnecessary.” Id.
(¶ 68} The controlling phrase in the 1989 DMA at issue here was “[a]ny mineral interest * * * shall be deemed abandoned and vested in the owner of the surface * * *.” Former R.C. 5301.56(B)(1), 142 Ohio Laws, Part I, at 986. The NCCUSL recognized the limitation of using the term “abandonment” in a statutory scheme because of its particular meaning at common law. While the concurring and dissenting opinion comes to a different conclusion, it nevertheless agrees that the General Assembly had the UDMIA “available as a model” in drafting the DMA. Concurring and dissenting opinion at ¶ 114. Therefore, the legislature knew that the NCCUSL stated in its prefatory note to the UDMIA that resolving dormant mineral interests through abandonment required evidence of the holder’s intent to abandon.
*529 C. R.C. 1.49(E): Consequences of a Particular Construction
{¶ 69} When two or more statutes are ambiguous and relate to the same subject matter, we also construe them in pari materia “to discover and carry out legislative intent.” Sheet Metal Workers’ Internatl. Assn., Local Union No. 33 v. Gene’s Refrigeration, Heating & Air Conditioning, Inc., 122 Ohio St.3d 248, 2009-Ohio-2747, 910 N.E.2d 444, ¶ 38, citing State ex rel. Ellis Super Valu, Inc. v. Indus. Comm., 115 Ohio St.3d 224, 2007-Ohio-4920, 874 N.E.2d 780, ¶ 13. This is true even if the related statutes were passed at different times. State ex. rel. Pratt v. Weygandt, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph two of the syllabus.
{¶ 70} As the lead opinion points out, the General Assembly enacted the DMA within the statutory scheme of the MTA. One of the purposes of the MTA is to facilitate and simplify land-title transactions by permitting a person to rely on the record chain of title. R.C. 5301.55. Because the DMA was enacted within the MTA, it is clear that one of the purposes of the DMA was to ensure that the transfer of dormant mineral rights to surface owners would occur within the record chain of title.
{¶ 71} The concurring and dissenting opinion concludes that the mere passage of time without a saving event was sufficient to complete the transfer. However, this conclusion is at odds with the purpose of the MTA.
{¶ 72} “Self-executing means * * * ‘effective immediately without the need of any type of implementing action.’ ” State ex rel. Vickers v. Summit Cty. Council, 97 Ohio St.3d 204, 2002-Ohio-5583, 777 N.E.2d 830, ¶ 31, quoting Black’s Law Dictionary 1364 (7th Ed.1999). If the 1989 DMA were self-executing, then the purpose of ensuring a record chain of title in discerning ownership of severed mineral interests would be subverted. See R.C. 5301.55. As the concurring and dissenting opinion properly concludes, the DMA “is absolutely silent as to any action required by the surface owner to effectuate the vesting of the mineral rights.” Concurring and dissenting opinion at ¶ 113. Therefore, if the statute were self-executing, it would create a transfer of ownership without any record in the chain of title, which is exactly what the MTA seeks to prevent.
{¶ 73} The conclusion that the 1989 DMA was self-executing would also impair the purpose of the DMA, which is “to clear title and promote the use of the mineral rights for development and production.” Chesapeake Exploration, L.L.C. v. Buell, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 25. Because the statute would operate to transfer mineral rights outside of the record chain of title, no mineral developer or speculator could readily rely on the record chain of title to purchase a severed mineral interest or enter into a production contract or lease. For example, a severéd-mineral-interest holder who is either unaware or who does not care that the mineral interest has reverted to the surface owner *530 could lease the mineral rights' to a lessee who would be unaware that the lessor has no mineral rights to lease because the reversion occurred outside the chain of title.
{¶ 74} In the end, the ramification of a self-executing provision would be to render the marketability of the mineral interest questionable. Any development of a mineral interest without the true owner’s consent subjects the trespasser to liability for damages. Brady v. Stafford, 115 Ohio St. 67, 79, 152 N.E. 188 (1926). Therefore, there is “an extreme reluctance to drill” without permission from all mineral-interest owners. Roberton, Abandonment of Mineral Rights, 21 Stan. L.Rev. 1227, 1233 (1969).
D. “Extinguished” and “Abandoned” Are Not Synonymous
{¶ 75} The General Assembly used the term “extinguish” to clear “interests and claims, existing prior to the effective date of the root of title.” R.C. 5301.47(A). Therefore, as used in the MTA, an “extinguishment” of a property interest occurs by operation of law.
{¶ 76} “Extinguish” means “[t]o bring an end to; to put an end to.” Black’s Law Dictionary 703 (10th Ed.2014). This court has used the term “extinguish” when referring to an interest in real property that is lost by automatic operation.
{¶ 77} In Lane v. Kennedy, we recognized that an owner of land who fails to prosecute an adverse possessor within the time permitted by law “raises a presumption of an extinguishment or a surrender of his claim.” 13 Ohio St. 42, 47 (1861); see also Grace v. Koch, 81 Ohio St.3d 577, 581, 692 N.E.2d 1009 (1998). In cases involving mortgage deeds, we have also recognized that “ ‘the equity of redemption is extinguished by release or foreclosure.’ ” Lloyd v. Quimby, 5 Ohio St. 262, 264 (1855), quoting Lockwood v. Sturdevant, 6 Conn. 373, 390 (1827).
{¶ 78} Appellate courts have also used the term “extinguish” in this way. See RBS Citizens, N.A. v. Krasnov, 8th Dist. Cuyahoga No. 100992, 2014-Ohio-4217, 2014 WL 4748528, ¶ 19 (wife’s property rights in a foreclosed home were extinguished when the home was sold at a sheriffs sale); Dir. of Highways v. Kramer, 23 Ohio App.2d 219, 227, 262 N.E.2d 561 (11th Dist.1970) (Cook, J„ dissenting) (“appropriation in fee simple of a parcel of property extinguishes all rights, visible and invisible, which the owner has in the parcel”); McCarthy v. Lippitt, 150 Ohio App.3d 367, 2002-Ohio-6435, 781 N.E.2d 1023, ¶ 33 (7th Dist.) (a partition order “extinguishes a tenant’s rights in the whole property, and establishes the tenant’s exclusive right of ownership in the part of the property set off to him”).
{¶ 79} In Lone Star Steakhouse & Saloon of Ohio, Inc. v. Ryska, the Eleventh District Court of Appeals distinguished between the extinguishment of an easement and the abandonment of an easement. 11th Dist. Lake No. 2003-L-192, *531 2005-Ohio-3398, 2005 WL 1538259. “[T]he extinguishment of an easement by the doctrines of estoppel or laches invokes a general inquiry into whether retaining the easement would be fair and equitable given the acts and/or omissions of the parties of interest.” Id. at ¶ 46. Conversely,
[m]ere non-use of an easement, for a period however long, will not amount to abandonment. In addition to the non-use, there must be acts or circumstances clearly manifesting an intention to abandon the easement. Intent to abandon an easement must be evidenced by decisive, unequivocal acts inconsistent with continued use and enjoyment of the easement. An intention to abandon is a material question, and it may be proved by an innumerable variety of acts. It is a question of fact to be ascertained from the circumstances of the case, and, in effect, no one case can be authority for another. The determination of whether an easement has been abandoned is a question of fact.
(Citations omitted.) Id. at ¶ 56.
{¶ 80} Therefore, unlike the term “abandon,” which requires an intent to relinquish property, the term “extinguish” operates regardless of intention.
{¶ 81} As stated above, the General Assembly used the term “extinguish” in the MTA, but chose to use the word “abandoned” in the DMA. Therefore, we must conclude that the legislature understood that the words had different meanings.

V. The 1989 DMA Was Not Self-Executing

A. Determination of Intent to Abandon Is Required
{¶ 82} Analyzing the DMA in light of the circumstances of its enactment, its legislative history, and the consequences of a particular construction, I conclude that the General Assembly’s decision to use the term “abandoned” establishes that it was not the legislature’s intent that the DMA be self-executing.
{¶ 83} In Heifner, the court highlighted the ineffectiveness of the MTA in terminating dormant mineral rights. 4 Ohio St.3d 49, 446 N.E.2d 440. The conveyance of minerals by will, which is a “title transaction” under the MTA, created an independent chain of title outside of the record chain. R.C. 5301.47(F). This frustrated the very purpose of the MTA—to facilitate and simplify title transactions by allowing persons to rely on a record chain of title. See R.C. 5301.55.
{¶ 84} As mentioned above, prior to amending the MTA and enacting the 1989 version of the DMA, the General Assembly heard testimony from a lawyer whose *532 firm had represented the appellants in Heifner. After pointing out the ineffectiveness of the MTA in extinguishing dormant severed mineral interests, the lawyer provided the General Assembly with a copy of the NCCUSL’s UDMIA, which included a prefatory note and comments.
{¶ 85} The prefatory note to the UDMIA stated that the common-law concept of abandonment was “useful,” but it was “limited both in scope and by practical proof problems” because it “required a difficult showing of intent.” On the other hand, using the “nonuse” scheme to extinguish dormant mineral interests required only proof of nonuse; proof of intent was not necessary. UDMIA prefatory note at 2.
{¶ 86} When it was drafting the DMA, the General Assembly was aware of its use of the term “extinguish” in the MTA. See R.C. 5301.47(A) (“ ‘Marketable record title’ means a title of record, as indicated in section 5301.48 of the Revised Code, which operates to extinguish such interests and claims, existing prior to the effective date of the root of title, as are stated in section 5301.50 of the Revised Code”). Nevertheless, the General Assembly chose a different term—“abandoned”—for use in the DMA. As explained above, these terms are not synonymous; they cannot be used interchangeably. Therefore, the General Assembly used the term “abandoned” for some definite purpose.
{¶ 87} As previously stated, the term “abandoned” had particular meaning in Ohio property common law, requiring an action and intent to relinquish. Therefore, by using “abandon” instead of “extinguish,” the legislature interjected the requirement of ascertaining the intent of the mineral-interest holder. The determination whether an owner of property abandoned the property is usually a question of fact and depends primarily on the intention of the owner. Kiser v. Logan Cty. Bd. of Commrs., 85 Ohio St. 129, 131, 97 N.E. 52 (1911). All the facts and circumstances must be considered. Id. Accordingly, a judicial action is required to make the determination.
{¶ 88} As previously mentioned, the concurring and dissenting opinion recognizes that the UDMIA was “available as a model” in drafting the DMA. Concurring and dissenting opinion at ¶ 114. However, the concurring and dissenting opinion ignores the prefatory note to the UDMIA. The General Assembly chose the word “abandoned,” which interjected the common-law meaning of abandonment into the DMA. That meant a surface owner seeking to reacquire a severed mineral estate must not only satisfy the statutory elements of the DMA but must also provide evidence that the holder intended to abandon the severed mineral estate. There is no opportunity for those determinations to be made if the DMA is self-executing.
*533 B. A Judicial Determination Is Needed to Establish Intent to Abandon, and Requiring a Judicial Determination of Abandonment Promotes the Purpose of the MTA
{¶ 89} By requiring a judicial action to determine whether there was an abandonment of a severed mineral interest under the 1989 DMA, the General Assembly ensured that the problem encountered in Heifner—a severed mineral interest transferred outside the record chain of title'—would not occur. Under the 1989 DMA, the trier of fact first had to determine whether any of the numerous saving events occurred. Upon finding that none had occurred, the trier of fact would then have to determine, based on all the surrounding facts and circumstances, whether the owner had intended to abandon the mineral interest.
{¶ 90} In addressing the weakness of the MTA as highlighted by our decision in Heifner, the General Assembly did not narrow the definition of “title transaction.” See R.C. 5301.47(F) (defining “title transaction”). That term has remained unchanged in the MTA and is still used to define one of the saving events in the DMA. R.C. 5301.56(B)(3)(a); former R.C. 5301.56(B)(1)(c)(i), 142 Ohio Laws, Part I, at 986.
{¶ 91} As defined in R.C. 5301.47(F), a decree of a court that affects the title to an interest in land is a “title transaction.” In accord with R.C. 5309.53, once the decree is filed with the recorder of the county in which the land is situated, it enters into the record chain of title.
{¶ 92} Judicial intervention, therefore, serves to facilitate both the paramount purpose of the MTA and the DMA because a recorded judgment indicating that a severed mineral interest has reverted to the surface owner provides notice within the record chain of title, which in turn promotes the use of mineral estates.
C. Use of the Term “Deemed” Does Not Indicate that the General Assembly Intended the 1989 DMA to Be Self-Executing
{¶ 93} The concurring and dissenting opinion asserts that the lead opinion should have employed the “common usage” of the word “deem,” and then it cites several cases from this court that it claims have interpreted “deemed” to mean that the deemed result “occurred automatically by operation of law.” Concurring and dissenting opinion at ¶ 120.
{¶ 94} In each of the statutes at issue in the cases cited in the concurring and dissenting opinion, there is an event, or events, that must occur before a particular result is “deemed” to have occurred. See State ex rel. Battin v. Bush, 40 Ohio St.3d 236, 533 N.E.2d 301 (1988) (unless due to an illness or injury, if a county officer fails to perform his or her duties for 90 consecutive days, the office shall be deemed vacant); State ex rel. Trago v. Evans, 166 Ohio St. 269, 141 N.E.2d 665 (1957) (same); State ex rel. Foster v. Madison Twp. Bd. of Edn., 151 *534 Ohio St. 413, 86 N.E.2d 598 (1949) (if a teacher is not notified of the school board’s intent to not rehire by a particular date, then the teacher is deemed to be reemployed); Jacot v. Secrest, 153 Ohio St. 553, 93 N.E.2d 1 (1950) (same).
{¶ 95} However, in all of these cases, the qualifying event that triggered the “deemed” result was typically simple to establish, its occurrence was uncontested, and the relevant statute did not require a determination of intent. In both Battin and Trago, there was no dispute that the officer in each case failed to perform his duties for 90 consecutive days, thereby triggering the deemed-vacant provision. Similarly, in Foster and Jacot, it was undisputed that the teacher in each case did not timely receive a notice not to rehire, and therefore both were “deemed” to be rehired.
{¶ 96} In the instant case, former R.C. 5301.56(B)(1) provided that a severed mineral interest “shall be deemed abandoned and vested in the owner of the surface, if none of the following applies * * *.” 142 Ohio Laws, Part I, at 986. Even if the concurring and dissenting opinion is correct that “deemed abandoned” meant that mineral interests were automatically deemed abandoned by operation of law, that language did not operate until a determination that none of the events enumerated in former R.C. 5301.56(B)(1)(c) had occurred. Moreover, because the DMA must be read in light of the particular meaning that the term “abandoned” had at the time the statute was enacted, a court, after concluding that the statutory elements indicated that the severed mineral interest was “deemed abandoned and vested in the surface owner,” was required to make an additional determination as to whether the mineral-interest holder intended to abandon the mineral interest. Therefore, I find that the cases cited in the concurring and dissenting opinion are distinguishable from the instant case and are not persuasive in determining whether it was the intention of the General Assembly to make the 1989 DMA self-executing.
D. Reliance on the Effect of Indiana’s Dormant-Mineral-Interest Statute Is Misplaced
{¶ 97} Contrary to the assertions in the concurring and dissenting opinion, Indiana’s dormant-mineral-interest statute that was reviewed by the United States Supreme Court in Texaco, Inc. v. Short, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982), is different from the DMA in two important ways. The first distinction is the language of the Indiana statute.
{¶ 98} Former Ind.Code 32-5-11-1, which was in a chapter entitled “Lapse of Mineral Interest,” provided:
Any interest in coal, oil and gas, and other minerals, shall, if unused for a period of 20 years, be extinguished, unless a statement of claim is filed in *535 accordance with section five hereof, and the ownership shall revert to the then owner of the interest out of which it was carved.
(Emphasis added.) In 2002, former Ind.Code 32-11-5-1 was amended slightly and recodified as Ind.Code 32-23-10-2. Pub.L. 2-2002.
{¶ 99} In drafting this statute, the Indiana legislature chose to use the word “extinguished.” Its use of that word is important. As highlighted by the prefatory note to the UDMIA discussed above, “[t]he nonuse scheme has advantages and disadvantages. Its major attraction is that it enables the extinguishment of dormant interests solely on the basis of nonuse; proof of intent to abandon is unnecessary.” (Emphasis added.) Id. at 2. By comparison, the Ohio General Assembly chose to use the word “abandoned,” understanding that its meaning under common law required an action and an intent to relinquish.
{¶ 100} The second distinction between the two statutes is the types of events that could serve as a saving event. The Indiana statute provided that a timely filed statement of claim would serve to “deem” that the mineral interest was being used. Former Ind.Code 32-5-11-4 (amended and recodified as Ind.Code 32-23-10-4, Pub.L. 2-2002). A recorder presented with a statement of claim was then required to record the statement of claim “in a book to be kept for that purpose.” Former Ind.Code 32-5-11-7 (recodified as Ind.Code 32-23-10-7, Pub.L. 2-2002).
{¶ 101} In comparison, the 1989 DMA used the language “if none of the following applies.” Former R.C. 5301.56(B)(1), 142 Ohio Laws, Part I, at 986. The statute then lists three sets of circumstances that preclude a severed mineral interest from being deemed abandoned and vested in the surface owner: (1) the severed mineral interest is in coal, (2) the severed mineral interest is owned by the government, or (3) one or more of six enumerated saving events occurred within the 20-year period as defined by the DMA. Former R.C. 5301.56(B)(1)(a), (b), and (c), 142 Ohio Laws, Part I, at 986.
{¶ 102} One of the listed saving events is that the mineral interest has been the “subject of a title transaction.” Former R.C. 5301.56(B)(1)(c)(i), 142 Ohio Laws, Part I, at 986. In Buell, this court held that pursuant to the plain language of R.C. 5301.47(F), the term “title transaction” means “ ‘any transaction affecting title to any interest in land,’ which means that it is not limited to the transactions enumerated in the statute or to transactions that transfer an ownership interest.” 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 39, quoting R.C. 5301.47(F). Therefore, there are numerous possibilities for what could constitute a “title transaction,” and only a court can make the determination whether a transaction is a title transaction.
*536 {¶ 103} The “if none of the following applies” language is a conditional barrier to deeming a severed mineral interest abandoned and vested in the surface owner. That language does not interfere with the operation of the statute; it merely requires a determination that none of the conditions have occurred during the 20-year period defined by the statute.

VI. Conclusion

{¶ 104} I fully agree with the majority’s analysis and resolution of the second certified question—a delay-rental payment is not a title transaction or a saving event. I also agree with the majority’s conclusion that the 1989 DMA, former R.C. 5301.56, was not self-executing and that a severed mineral interest could not revert to the surface owner absent judicial action. Therefore, I agree with the majority that the answer to the first certified question is that the 2006 version of the DMA applies to all claims asserted after June 30, 2006. However, in my view, the 1989 DMA was ambiguous regarding what was required for a severed mineral interest to be “abandoned.”
{¶ 105} After considering “other matters” pursuant to R.C. 1.49 to determine the intent of the General Assembly in enacting the 1989 DMA, I would interpret the phrase “deemed abandoned and vested in the owner of the surface” as requiring evidence that none of the statutory elements of the 1989 DMA, former R.C. 5301.56(B)(1)(a) through (c), apply and that the holder of the severed mineral interest intended to abandon them.
{¶ 106} Respectfully, I concur in judgment only in the lead opinion’s answer to the first certified question and concur in its answer to the second certified question.