[Cite as *JPMorgan Chase Bank, N.A. v. Gau*, 2016-Ohio-7646.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A., SUCCESSOR BY MERGER TO CHASE HOME FINANCE, LLC, | : | **O P I N I O N** |
| | : | |
| Plaintiff-Appellee, | : | **CASE NO. 2015-A-0048** |
| | : | |
| - vs - | : | |
| | : | |
| RUSSELL L. GAU, et al., | : | |
| Defendants, | : | |
| | : | |
| JENEE S. GRAY, et al., | : | |
| Defendants-Appellants. | : | |

Civil Appeal from the Ashtabula County Court of Common Pleas, Case No. 2008 CV 00884.

Judgment: Affirmed.

*Monica E. Russell,* Critchfield, Critchfield & Johnston, LTD., 4996 Foote Road, Medina, OH 44256, and *Craig A. Thomas,* Lerner Sampson & Rothfuss, 120 East Fourth Street, Cincinnati, OH 45202 (For Plaintiff-Appellee).

*Michael J. Drain,* 147 Bell Street, #202, Chagrin Falls, OH 44022 (For Defendants-Appellants).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellants, Jenee S. Gray and Doresa Gray, appeal the Judgment Entry of the Ashtabula County Court of Common Pleas, ordering the reformation of certain instruments with respect to their legal description of property, part

of which was subject to a mortgage held by plaintiff-appellee, Chase Home Finance, LLC. The issues before this court are whether errors in the legal description of real property which accrued to the benefit of third parties may be corrected by reformation and whether a party may raise the defense of the Ohio Marketable Title Act for the first time on appeal. For the following reasons, we affirm the decision of the court below.

{¶2} On June 24, 2008, Chase Home Finance filed a Complaint in Foreclosure against Russell L. Gau, Jodi L. Gau, and The Second National Bank in the Ashtabula County Court of Common Pleas. Chase Home Finance sought the foreclosure of a mortgage secured by two parcels of property, Permanent Parcel Nos. 29-018-00-023-00 and 29-018-00-022-00, described as being part of Lot 43 in Lenox Township.

{¶3} On October 1, 2010, Chase Home Finance filed an Amended Complaint for Reformation, Declaratory Judgment, Foreclosure, and Other Claims against various defendants, including the Grays.[1] The Amended Complaint alleged that the legal description of the Gaus' property is "ambiguous, contains errors, and does not accurately describe * * * the property owned by the Gaus that they intended to encumber with the Chase Mortgage."

{¶4} The Amended Complaint further alleged that the Grays own a parcel of property, Permanent Parcel No. 29-015-00-001-00, "north of and adjacent to the [Gaus'] Property," the deed to which also contains a "defective legal description." Chase Home Finance contended "[t]he Grays may claim to have an interest in the [Gaus'] Property by

---

1. Other defendants, not parties to this appeal, include: Russell L. Gau, Jodi L. Luke, The Second National Bank, Russell R. Gau, Edgar J. Moore, Sedell Moore, Nathan Hall, and Kenneth Weathers. Russell Gau may refer to father or son, denominated Sr. and Jr. in this opinion for the sake of clarity. Jodi Luke was identified as Jodi Gau, the wife of Gau Jr., in the original Complaint. Their marriage was terminated during the course of these proceedings.

virtue of the defects in * * * the Gray Deed and/or the incorrect legal descriptions of the [Gaus'] Property."

{¶5} Chase Home Finance sought, inter alia, the reformation of written instruments containing legal descriptions of the Gaus' property and the Grays' property, a declaration that the Gaus "have good title to the entire fee simple interest" in their property as described in the reformed instruments, and that title to the Gaus' property as described in the reformed instruments be quieted.

{¶6} On December 9, 2010, the Grays filed their Answer and Counterclaim and Cross-Claims with leave granted by the trial court. The Grays alleged that they are "the owners of a certain parcel of real property located in the Township of Lenox and identified as Lot Nos. 38 and 43, Permanent Parcel No. 29-015-00-001-00," and that Chase Home Finance's claims "constitute a cloud on the title of these defendants." In their counterclaim, the Grays raised claims to quiet title and for declaratory judgment. They asserted that the legal description of their property as described in a survey performed on November 29, 2008, "is full and accurate and free of any claims by the plaintiff and/or any codefendants."

{¶7} In their cross-claim, the Grays raised similar claims (quiet title and declaratory judgment) against their co-defendants, as well as claims of adverse possession and ejection.

{¶8} On February 14, 2011, Chase Home Finance filed its Reply to the Counterclaim.

3

**{¶9}** On May 31, 2011, the trial court entered an order substituting "JPMorgan Chase Bank, N.A. successor by merger to Chase Home Finance LLC" as party plaintiff in place of Chase Home Finance, LLC.

**{¶10}** On October 23, 2014, the case was tried before the court.

**{¶11}** Russell Lew Gau, Jr. testified that he bought property in August 1995 from the Estate of James Chambliss for about $48,500. The property consisted of two lots, one having a house (Permanent Parcel No. 29-018-00-023-00 at 2889 State Route 46 South) and the other vacant (Permanent Parcel No. 29-018-00-022-00). Raford and Lucille Odom (the Grays' predecessors in interest) lived on the property to the north of the residential parcel. The Odoms acknowledged that the house belonged to Gau Jr.'s property.

**{¶12}** In August 2008, Gau Jr. vacated the dwelling as a result of his divorce. In 2010, he learned the Grays were living in the house without his permission.

**{¶13}** Thomas Joseph O'Hara, a professional surveyor with O'Hara Land Surveying, conducted a survey of Gau Jr.'s two parcels of property in May 2010 on behalf of Chase Home Finance. O'Hara noted inconsistencies between the descriptions contained in the Gaus' and the Grays' property deeds which failed to account for the property in Lot 43. Accordingly, O'Hara researched the "parent parcel and then put together the puzzle of all the exceptions to the parent parcel."

**{¶14}** The parent or original parcel was a 39-acre lot. In the first half of the nineteenth century, a 9.25-acre parcel was excepted out of Lot 43, becoming part of Permanent Parcel No. 29-015-00-001-00 (currently owned by the Grays). In 1959, two 100-by-350-foot residential parcels were created out of Lot 43. One of these

4

(Permanent Parcel No. 29-018-00-023-00) contains the house purchased by Gau Jr. in 1995. In 1981, the remainder of Lot 43 was divided into two vacant parcels. O'Hara testified that the deeds creating these two vacant parcels gave inaccurate legal descriptions of the properties.[2] Essentially, the legal descriptions in the deeds did not account for the 29.75 acres that remained after the exception of 9.25 acres in the nineteenth century resulting in a deficit of 1.5 acres. O'Hara testified: "They made a mistake with the balance of land after they created the two smaller 100-by-350 foot parcels * * * in dividing the remaining land into two pieces." The mistakes in the 1981 deeds were perpetuated in subsequent transfers of the property.

{¶15} When O'Hara surveyed the parcels based on pre-1981 documentation, the house securing the mortgage was located on Gau Jr.'s property as part of Permanent Parcel No. 29-018-00-023-00.

{¶16} Greg Polles, an independent professional surveyor, surveyed the Grays' property in 2003 on their behalf. Polles was unable to survey the property based on the description contained in the 2003 fiduciary deed due to a lack of monumentation, which required him to use the Gaus' deeds to determine the boundary of the Grays' property.

{¶17} Polles concluded that, as a result of the prior transfers of the Gaus' property resulting in the creation of two residential parcels and two vacant parcels, the size of the Grays' property increased.

> The nine-and-a-quarter acres * * * was created back in 1839 and so forth. But when Chambliss and Hall created the new properties [in 1981], and they described those properties * * *, the land that was left by them blocking out that piece is 10.75 acres. A change took place, for what reason I don't know, but * * * when they transferred

---

2. O'Hara testified that it was his belief that no survey was performed when the lots were divided in 1981 based on a lack of monumentation for these parcels.

their properties, they left 10.75 acres not accounted for, which they specified was Mr. Odom's [or the excepted] property.

{¶18} Jimmie Gray, Doresa's husband and Jenee's father, testified that he purchased the property for Jenee in 2003 for $18,500. Jimmie did not pay real estate taxes on the house until 2008. Prior to 2008, he only paid taxes on vacant land.

{¶19} On November 18, 2014, the trial court issued a Judgment Entry, ordering the deeds for the affected parcels of land to be reformed to conform to the legal descriptions contained in O'Hara's survey. The court found, in relevant part, as follows:

> In this case, the Gau Jr. Property, the Gau Sr. Property, and the portion of the Gray Property that was located in Lot 43 were once part of a single 39 acre tract of land. Pursuant to the testimony of O'Hara as well as the stipulated exhibits, of this 39 acre tract, the Grays' predecessors-in-title received 9.25 acres, and the predecessors-in-title to the Gaus received the remaining 29.75 [acres]. When the Gau Jr. and Gau Sr. parcels were divided in 1981, a mistake was made in the legal descriptions, leaving each parcel with less land than there existed to be conveyed.
>
> These two deeds created the problem with the descriptions for the Gau Jr. and Gau Sr. Properties. As they stand presently, the Gau Jr. and Gau Sr. deeds describe the properties as having a combined total frontage of 270 feet on Route 46. However, there existed to be conveyed a total frontage of 367.43 feet. Both Polles and O'Hara agree that the descriptions on the Gau Jr. and Gau Sr. properties are incorrect because they do not result in closed parcels of land. But rather than attribute the discrepancy to incorrect descriptions, Polles believes that it reflects the intent of the Gaus['] predecessors-in-interest to give the Odoms an additional 1.25 acres in Lot 43. As stated earlier, the Court does not agree with Polles' conclusion. It is far more plausible that the descriptions, which are undisputedly incorrect, are merely incorrect, and they do not reflect an undocumented intent to transfer land to a third party.

{¶20} On July 28, 2015, the trial court journalized an Entry Granting Summary Judgment and Decree in Foreclosure, which disposed of all pending claims in the case.

6

{¶21} On August 27, 2015, the Grays filed a Notice of Appeal. On appeal, they raise the following assignments of error:

{¶22} "[1.] The trial court committed prejudicial error against the Grays because it misread the conveyance from Chambliss and Hall to the Gaus as a partial conveyance of property to the Grays."

{¶23} "[2.] The trial court failed to apply the Ohio Marketable Title Act so as to rule out any challenge to the Gray property by Chase."

{¶24} "[3.] The trial court order of November 18, 2014 was against the manifest weight of the evidence."

{¶25} "It is well-established that 'reformation of an instrument is an equitable remedy whereby a court modifies the instrument which, due to mutual mistake on the part of the original parties to the instrument, does not evince the actual intention of those parties.'" (Citation omitted.) *Mong v. Kovach Holdings, LLC*, 11th Dist. Trumbull No. 2012-T-0063, 2013-Ohio-882, ¶ 20; *Greenfield v. Aetna Cas. & Sur. Co.*, 75 Ohio App. 122, 127-128, 61 N.E.2d 226 (12th Dist.1944) ("'reformation' is defined as the remedy afforded by courts possessing equitable jurisdiction to the parties and the privies of parties, to written instruments which import a legal obligation to reform or rectify such instruments whenever they fail, through fraud or mutual mistake, to express the real agreement or intention of the parties").

{¶26} The remedy of reformation is applicable to the legal description of property contained in a deed. *Davis v. Cassady*, 4th Dist. Ross No. 1303, 1987 Ohio App. LEXIS 6283, 5 (Mar. 23, 1987). The parties' true intentions may be demonstrated by parol evidence, and must be proven by clear and convincing evidence. *Mong* at ¶ 21.

7

{¶27} In the first assignment of error, the Grays contend the trial court erred by "insisting that [they] produce a conveyance that reflects a slightly larger parcel for the Grays," and failing to recognize that the increase in size was the result of Polles' 2008 survey: "The trial court did not understand that an actual survey of the property could very well result in more acreage than the parties originally contemplated. * * * The Grays did not need a conveyance to assert that they owned the 'disputed parcel;' they already owned it by virtue of the legal description contained in their 2003 deed." Reply brief at 5.

{¶28} The Grays' argument fails to demonstrate error by the trial court. Rather, the Grays have failed to put forth any argument as to why they should benefit from the errors contained in the 1981 deeds. The claim that they acquired title to the disputed 1.25 acres of property, including the house, by virtue of the legal description in their 2003 deed is manifestly absurd.

{¶29} The 2003 fiduciary deed transferring the property to the Grays expressly describes Permanent Parcel No. 29-015-00-001-00 as "containing 33.25 acres of land," a description that would necessarily exclude the additional 1.25 acres of the Gaus' property. Tax records for 2003 and the years preceding the Grays' acquisition describe the land as unimproved.[3] The Grays acquired the property from the Estate of Raford and Lucille Odom for $18,500. The inventory and appraisal of the Odom Estate described the land as "unimproved lots" with a value of $12,500. According to Gau Jr.'s testimony, the Odoms recognized the house as part of his property. When the Grays hired Polles to survey the property in 2003, they believed their property was vacant

---

3. In fact, Permanent Parcel No. 29-015-00-001-00 continued to be taxed as unimproved land until 2009 – after Polles' survey and revised legal description of the Grays' property was filed with the recorder.

land. *See Castle v. Daniels*, 16 Ohio App.3d 209, 213, 475 N.E.2d 149 (2d Dist.1984) ("[i]n light of the overwhelming evidence indicating the appellants did not believe they were obtaining the disputed land in the conveyance we see no justifiable reason for disturbing the trial court's order [of reformation]").

{¶30} Polles acknowledged that the Grays' only claim to the additional 1.25 acres was based on the "reconfiguration" of the property in the 1981 deeds. When asked why the earlier descriptions of the parcels should not serve as a guide to setting the boundary lines, Polles opined that they "were superseded * * * by the new descriptions." This court is unaware of any legal authority that supports Polles' theory of supersession. While conveyance is not the sole means by which an interest in property may be acquired, the Grays have done little more than merely claim the windfall created by admittedly inaccurate 1981 deeds. *See Ormsby v. Longworth*, 11 Ohio St. 653, 668 (1860) (rejecting the argument that the passage of time should prevent reformation of the instrument "where the correcting of the mistake disturbs no possession, and interferes with no investment in the way of improvements, or the like, made on the faith of the mistaken instrument").

{¶31} The first assignment of error is without merit.

{¶32} In the second assignment of error, the Grays argue that any challenge to their claim to the disputed land is precluded by Ohio's Marketable Title Act.

{¶33} This argument was never raised in the trial court and, therefore, has been waived. *Wells Fargo Bank, N.A. v. Watson*, 11th Dist. Ashtabula No. 2014-A-0062, 2015-Ohio-2599, ¶ 64 ("[w]here a party asserts an argument for the first time on appeal, the argument is waived"); *Brown Bark I.L.P. v. Rubertino*, 11th Dist. Lake No. 2009-L-

046, 2009-Ohio-5897, ¶ 24; *Tivenan v. Lons*, 9th Dist. Medina No. 03CA0147-M, 2004-Ohio-4975, ¶ 7 ("Appellants' argument that the Ohio Marketable Title Act provides a defense to Appellees' easement has been waived by their failure to raise it at the trial court level").

{¶34} The second assignment of error is without merit.

{¶35} In the third assignment of error, the Grays argue that the trial court's decision to reform the legal descriptions of the property is against the manifest weight of the evidence: "the Chambliss and Hall deeds reconfigured the Gaus' property such that the adjoining Odom [now Gray] property included the subject house in its 10.75 acres; and that Gaus' northern boundary [i.e. the Grays' southern boundary] falls short of the house, which is on the Grays' property." Appellant's brief at 14.

{¶36} The preceding evidence is undisputed. Thus, the issue is not properly one of manifest weight but, rather, what are the legal ramifications of the 1981 warranty deeds, i.e., whether errors in the 1981 deeds should deprive Gau Jr. of property he paid for and maintained or whether the errors should entitle the Grays to a home and property they did not pay for. Reformation is an equitable remedy where "the court has considerable discretion in attempting to fashion a fair and just remedy." *Winchell v. Burch*, 116 Ohio App.3d 555, 561, 688 N.E.2d 1053 (11th Dist.1996); *McDonald & Co. Secs., Inc. v. Alzheimer's Disease & Related Disorders Assn.*, 140 Ohio App.3d 358, 366, 747 N.E.2d 843 (1st Dist.2000) (under equitable principles the court "has the power to fashion any remedy necessary and appropriate to do justice in a particular case"). Reformation of the deeds according to the O'Hara survey in the present case is a fair and just remedy.

**{¶37}** The third assignment of error is without merit.

**{¶38}** For the foregoing reasons, the Judgment Entry of the Ashtabula County Court of Common Pleas, ordering the reformation of the relevant instruments to conform to the legal descriptions of the property as contained in the O'Hara survey, is affirmed. Costs to be taxed against appellants.


TIMOTHY P. CANNON, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____


COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

**{¶39}** I respectfully dissent.

**{¶40}** In their first assignment of error, the Grays argue the trial court erred in misreading the conveyance from Chambliss and Hall to the Gaus as a partial conveyance of property to them. The Grays assert the trial court misunderstood the nature of their surveyor's testimony. The Grays allege that conveyances in 1981 reconfigured the Gaus' property which resulted in the disputed parcel now being a part of the Grays' property. Thus, the Grays maintain they did not need a conveyance to assert they owned the disputed parcel but rather they already owned it by virtue of their 2003 deed. The Grays further contend that Polles' 2008 survey, in fact, gave them the extra acreage.

**{¶41}** Because the legal descriptions in the Gau Jr. and Gau Sr. vacant parcels were derived from the 1981 incorrect deeds, recorded by Chambliss and Hall, the trial court found they were subject to reformation in favor of the Gaus and Chase. "'It is well-established that "reformation of an instrument is an equitable remedy whereby a court modifies the instrument which, due to mutual mistake on the part of the original parties to the instrument, does not evince the actual intention of those parties."' *Zwaryz v. Wiley*, 11th Dist. No. 98-A-0073, 1999 Ohio App. LEXIS 3867 (Aug. 20, 1999), *4, citing *Mason v. Swartz*, 76 Ohio App.3d 43, 50 * * * (6th Dist.1991)." (Parallel citation omitted.) *Mong v. Kovach Holdings, LLC*, 11th Dist. Trumbull No. 2012-T-0063, 2013-Ohio-882, ¶20.

**{¶42}** The standard of review applicable to claims for equitable relief, including reformation, is abuse of discretion. *See Wells Fargo Bank Minn. v. Mowery*, 187 Ohio App.3d 268, 2010-Ohio-1650, ¶23-24 (4th Dist.), citing *Sandusky Properties v. Aveni*, 15 Ohio St.3d 273, 274-275 (1984). Regarding this standard, the term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. *State v. Ferranto*, 112 Ohio St. 667, 676-678 (1925). An abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶15 (8th Dist.).

**{¶43}** Courts mainly look to what title records recognize in determining property issues. However, other methods to acquiring title include adverse possession and acquiescence.

12

{¶44} "Acquiescence is a legal concept that determines the boundary line between two properties and overrules the boundary listed in the deeds.  If the law of acquiescence applies, one property owner loses title to some amount of land and the other property owner gains it.  * * * This is similar to the doctrine of adverse possession, however there is no requirement that the actions be hostile, instead it is based on a mutual mistake."   www.legalmatch.com/law-library/article/acquiescence-to-a-boundary-line.html

{¶45}  There is a great amount of case law in Ohio concerning acquiring title by adverse possession but very little regarding acquiescence.  However, this court recently dealt with the doctrine of acquiescence in *Golubski v. United States Plastic Equip., LLC*, 11th Dist. Portage No. 2015-P-0001, 2015-Ohio-4239, ¶27, 33 (holding "[t]he doctrine of acquiescence is applicable in instances where adjoining land owners occupy their properties up to a certain line and mutually acknowledge and treat that boundary as though it is the actual boundary separating their properties.  * * * (citations omitted.) 'Acquiescence rests on the practical reality that oftentimes, the true boundary line location is uncertain and neighbors may themselves establish boundaries.'" * * * The doctrine of acquiescence may apply even when the parties are under a mistake as to the true boundary line.)

{¶46}  With that said, I now turn to the facts in this case.  The Grays stress that the trial court mistakenly interpreted the testimony, especially that of their surveyor, Polles, to mean that the Grays were asserting that there was a partial conveyance of property from the predecessor of the Gaus (Chambliss and Hall) to the predecessor of

13

the Grays (Odom).  In support of their position, the Grays point to the following colloquies in the transcript from the October 23, 2014 bench trial:

**{¶47}** "[COUNSEL FOR CHASE]: Yes, Your Honor.  I thought it was getting confused here.  It's making it sound as though there was a conveyance of land from the Gaus' predecessors-in-interest, Chambliss and Hall, to the Grays' predecessors-in-interest * * *.

**{¶48}** "* * *

**{¶49}** "THE COURT: And according to your [Polles] survey, they're conveying an acre and a half more than they even own, which can't be.  They can't transfer property they don't own.

**{¶50}** "[POLLES]: No, they - - when Chambliss and Hall reconfigured this property, the - - the reconfiguration that they gave to Mr. Odom through their description if they - - was ten and a quart - - ten and a half – 10.75 acres."  (Transcript, Volume I, pages 111-112).

**{¶51}** The Grays point out that the trial court, however, was stuck with this mistaken impression.  The colloquy continued:

**{¶52}** "THE COURT: Sustain the objection.  Chambliss and Hall did not convey to Grays.

**{¶53}** "* * *

**{¶54}** "THE COURT: But, but my point is, if they transfer nine-and-a-quarter acres in original Lot 43, there's no way Chambliss and Hall, by coming up with a new description, can transfer more than that amount of property; because first of all, the

14

grantor didn't have it to transfer, and whoever he transferred it to didn't get any more than the grantor had.

{¶55} "I mean, it seems to me you're telling me that Chambliss and Hall created some new descriptions, and they just created an extra acre and a half that - -

{¶56} "[POLLES]: That's exactly - - that's exactly what they did.

{¶57} "THE COURT: Well, I don't think they can do that. You can't transfer what you don't own. You can't give more rights than you have when you transfer something.

{¶58} "* * *

{¶59} "[POLLES]: Well, they owned the land around nine-and-a-quarter acres and by reconfiguring it they could add to that exception by making Mr. Odom's property larger." (Transcript, Volume I, pages 112-117).

{¶60} Nevertheless, the November 18, 2014 judgment entry continues the trial court's mistaken interpretation of what happened in the Chambliss and Hall deeds. I agree with the Grays that the trial court erred in misinterpreting what actually happened in the parties' predecessors' conveyances.

{¶61} The record reveals that Polles was merely trying to communicate to the trial court that a survey of the Grays' property results in more acreage than originally considered, not that there was a separate conveyance of property to the Grays. In support of the Grays' arguments, the 1933 deed (when the legal description was created) does not contain a metes and bounds description. Rather, it contains a description that references other conveyances in order to create a parcel thought to contain 33.25 acres.

15

{¶62} Also, in 1981, Gau Jr. and Gau Sr. acquired their properties from Chambliss and Hall. The Gaus' parcels were immediately to the south and adjacent to the Grays' parcel. The conveyance from Chambliss and Hall to the Gaus comprised only 270 feet instead of 367.43. According to Polles, because the Grays' legal description was not a metes and bounds description, he had to conduct his survey with reference to the Gaus' property. Polles indicated that measuring 270 feet from the southernmost line of the Gaus' property, the disputed parcel falls on the Grays' property. Thus, the 1981 conveyances to the Gaus affected the Grays' property because they reconfigured the property which resulted in the disputed parcel now being located on the Grays' property instead of the Gaus'.

{¶63} Furthermore, the only survey conducted of the Grays' parcel from 1933 (when the legal description was created) occurred in 2008. Polles measured the property and discovered that the legal description comprised 10.70 acres instead of 9.25 and that the disputed parcel was on the Grays' property. Thus, what was once thought to be 9.25 acres in 1933 when the legal description was created actually turned out to be 10.70 acres when it was surveyed by Polles.

{¶64} The trial court failed to see that an actual survey of the property could result in more acreage than the parties originally contemplated. The Grays owned the disputed parcel by virtue of the legal description contained in their 2003 deed. In addition, pursuant to Polles' survey, the boundary line between the Gau and Gray properties has been established by the doctrine of acquiescence.

{¶65} I believe the Grays' first assignment of error has merit.

16

**{¶66}** In their second assignment of error, the Grays contend the trial court failed to apply the Ohio Marketable Title Act so as to rule out any challenge to their property by Chase.

**{¶67}** The Grays did not specifically raise an argument relating to the Ohio Marketable Title Act in the trial court. However, because the Marketable Title Act deals with marketability in commerce, it can always be raised as it should be construed in pari materia with the recording statutes. *Spellman Outdoor Advertising Servs., LLC v. Ohio Turnpike and Infrastructure Comm.*, 11th Dist. Portage No. 2015-P-0081, 2016-Ohio-7152, ¶37 (Grendell, J., concurred in judgment only with a Concurring Opinion), citing *Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St.3d 490, 2015-Ohio-4551, ¶109-111 (Kennedy, J., concurring and concurring in part). The Marketable Title Act deals with a time period and is separate from a chain of title analysis.

**{¶68}** This writer is aware that other districts have determined that the Ohio Marketable Title Act must be raised as a defense. *See Collins v. Moran*, 7th Dist. Mahoning No. 02 CA 218, 2004-Ohio-1381, ¶20 (holding that because the appellants did not assert the Ohio Marketable Title Act as a defense at trial or in their objections to the magistrate's decision it is normally treated as being waived on appeal); *Tivenan v. Lons*, 9th Dist. Medina No. 03CA0147-M, 2004-Ohio-4975, ¶7 (holding that the appellants' argument that the Ohio Marketable Title Act provides a defense to the appellees' easement was waived by their failure to raise it at the trial court level). However, this court has found the reasoning of our Sister courts misplaced. *See Spellman, supra,* at ¶37, fn.2.

17

**{¶69}** The Ohio Marketable Title Act can always be raised by following the general reasoning that the Act should be construed in pari materia with the recording statutes. *Spellman, supra,* at ¶37, fn.2., citing *Chesapeake, supra,* at ¶109-111 (Kennedy, J., concurring and concurring in part). The Ohio Marketable Title Act is a statute that governs in conjunction with the recording statutes and, as such, it is not an affirmative defense such as adverse possession or acquiescence.

**{¶70}** The essence of property starts with the root of marketable title which cannot change. Property rights and ownership is a paramount concern which ensures continuity of transfers and settles claims to property. Property is property. If we allow the Ohio Marketable Title Act to solely be used as a defense it would negate the legislative intent to establish an effective methodology for determining transferring of marketable titles to third party purchasers for value. This interpretation creates a sense of musical chairs and allows courts to act as Monday morning quarterbacks by modifying the ownership of property retroactively into the past. Thus, that is why this writer finds it necessary to read the Ohio Marketable Title Act in conjunction with the recording statutes.

**{¶71}** Like jurisdiction, which can be raised at any time, so should the Ohio Marketable Title Act. In addition, adverse possession and acquiescence can be raised as claims or defenses. Likewise, the Ohio Marketable Title Act should be able to be raised as a claim not subject to waiver. If there is an error in title, failure to raise should not become an issue.

**{¶72}** This court in *Spellman, supra,* at ¶55-57, has agreed with the reasoning of Justice Kennedy in *Chesapeake, supra*, at ¶109-111:

18

**{¶73}** ""(M)arketable title acts are intended to operate in conjunction with, rather than as a substitute for, the recording statutes." *Spring Lakes,* [*Ltd. v. O.F.M. Co.*, 12 Ohio St.3d 333], 338 (* * *) (Holmes, J., concurring). "(T)he purpose of the recording statutes is to give notice to all persons subsequently acquiring rights or interests in the land." *Marshall v. Ebling*, 70 Ohio App. 145, 155 * * * (* * *) (7th Dist.1942). As noted by the Supreme Court of Rhode Island, "(t)he general purpose of land-recording statutes is to provide a public record of transactions *affecting title* to land." (Emphasis added.) *In re Barnacle*, 623 A.2d 445, 447 (R.I.1993)

**{¶74}** ""It is a well-settled rule of statutory interpretation that statutory provisions be construed together and the Revised Code be read as an interrelated body of law." *State v. Moaning*, 76 Ohio St.3d 126, 128 * * * (* * *) (1996). Where statutes address the same subject matter, "(they) must be construed in pari materia and harmonized so as to give full effect to the statutes." *State ex rel. City of Westlake v. Corrigan*, 112 Ohio St.3d 463, 2007-Ohio-375 * * * (* * *) ¶20.

**{¶75}** "'Because a marketable title requires an easily traceable chain of recorded title consideration of the recording statutes is necessary.'"

**{¶76}** "Harmonizing the provisions of the [Ohio Marketable Title Act] with the recording statutes * * * reveals a commonality with the examples of title transactions listed in R.C. 5301.47(F)." *Chesapeake, supra,* at ¶116 (Kennedy, J., concurring and concurring in part); *see also* James A. Carr II, *A Practitioner's Guide to the Ohio Marketable Title Act,* 7 Appalachian Nat. Resources L.J. 25 (2012-2013) (the statute defining "title transaction" is in pari materia with the statute defining "root of title" and they must be interpreted together); K.D. Benhart, *The Mechanics of Iowa's Marketable*

19

*Title Legislation,* 22 Drake L. Rev. 326 (1972-1973) (Iowa's several statutes concerning marketability of land titles and other correlative statutes are statutes in pari materia and therefore must be construed together).

{¶77} With that said, by way of background, "'[t]he General Assembly enacted the Ohio Marketable Title act in 1961, "(* * *) to simplify and facilitate land title transactions by allowing persons to rely on a record chain of title (* * *)." The act is to be construed liberally to effect that purpose. *Semachko v. Hopko* (1973), 35 Ohio App.2d 205, 209 * * * (* * *).' *Ealy v. Nixon*, 6th Dist. Erie No. E-09-046, 2010-Ohio-2120, ¶26; *see Evans v. Thomas J. Evans Found.*, 5th Dist. Licking No. 09 CA 76, 2010-Ohio-541, ¶17 ('Ohio's Marketable Title Act, R.C. 5301.47 to 5301.56, which became law (over) fifty years ago as a means of simplifying land title transactions by allowing persons to rely on a record chain of title as set forth in the pertinent statutes and by eliminating "ancient interests" which operate to cloud otherwise clear titles. (* * *) The Act functions as "a 40-year statute of limitations for bringing claims against a title of record." (* * *) R.C. 5301.55 states that the Act "shall be liberally construed to effect the legislative purpose of simplifying and facilitating land title transactions (* * *)."' (Citations omitted.)); *see also* www.oilandgaslawreport.com/2013/11/14/the-ohio-dormant-minerals-act-part-1 ('Note that there is no notice requirement to or for the benefit of possible adverse claimants. It's automatic.')

{¶78} "The Ohio Marketable Title Act states:

{¶79} "'Any person having the legal capacity to own land in this state, who has an unbroken chain of title of record to any interest in land for forty years or more, has a

marketable record title to such interest as defined in section 5301.47 of the Revised Code, subject to the matters stated in section 5301.49 of the Revised Code.

{¶80} "'A person has such an unbroken chain of title when the official public records disclose a conveyance or other title transaction, of record not less than forty years at the time the marketability is to be determined, which said conveyance or other title transaction purports to create such interest, either in:'

{¶81} "'(A) The person claiming such interest; or'

{¶82} "'(B) Some other person from whom, by one or more conveyances or other title transactions of record, such purported interest has become vested in the person claiming such interest; with nothing appearing of record, in either case, purporting to divest such claimant of such purported interest." R.C. 5301.48."

{¶83} "R.C. 5301.47(A) provides: "'(m)arketable record title"' (* * *) operates to extinguish such interests and claims, existing prior to the effective date of the root of title (* * *).'

{¶84} "Similarly, R.C. 5301.50 provides: '(* * *) record marketable title shall be held by its owner and shall be taken by any person dealing with the land free and clear or all interests, claim, or charges whatsoever, the existence of which depends upon any act, transaction, event, or omission that occurred prior to the effective date of the root of title. All such interests, claims, or charges, however denominated, whether legal or equitable, present or future, whether such interests, claims or charges are asserted by a person sui juris or under a disability, whether such person is within or without the state, whether such person is natural or corporate, or is private or governmental, are hereby declared to be null and void.'

{¶85} "Marketable record title is subject to matters specified at R.C. 5301.49:

{¶86} "'(A) All interests and defects which are inherent in the muniments of which such chain of record title is formed; provided that a general reference in such muniments, or any of them, to easements, use restrictions, or other interests created prior to the root of title shall not be sufficient to preserve them, unless specific identification be made therein of a recorded title transaction which creates such easement, use restriction, or other interest; and provided that possibilities of reverter, and rights of entry or powers of termination for breach of condition subsequent, which interests are inherent in the muniments of which such chain of record title is formed and which have existed for forty years or more, shall be preserved and kept effective only in the manner provided in section 5301.51 of the Revised Code;'

{¶87} "'(B) All interests preserved by the filing of proper notice or by possession by the same owner continuously for a period of forty years or more, in accordance with section 5301.51 of the Revised Code;'

{¶88} "'(C) The rights of any person arising from a period of adverse possession or user, which was in whole or in part subsequent to the effective date of the root of title;'

{¶89} "'(D) Any interest arising out of a title transaction which has been recorded subsequent to the effective date of the root of title from which the unbroken chain of title or record is started; provided that such recording shall not revive or give validity to any interest which has been extinguished prior to the time of the recording by the operation of section 5301.50 of the Revised Code;'

{¶90} "'(E) The exceptions stated in section 5301.53 of the Revised Code.'

{¶91} "'As stated in *Toth v. Berks Title Ins. Co.* (1983), 6 Ohio St.3d 338, 342 * * * (* * *), '(i)n general, the Marketable Title Act operates to extinguish interests and claims in existence prior to the effective date of the root of title." See R.C. 5301.47(A) and 5301.50. However, R.C. 5301.49 and 5301.51 provide for the preservation of certain interests in existence prior to the root of title if properly noted subsequent to the root of title. Thus, the Marketable Title Act does not bear upon interests which are created after the date of the root of title.'

{¶92} "'"Root of title' means that conveyance or other title transaction in the chain of title of a person, purporting to create the interest claimed by such person, upon which he relies as a basis for the marketability of his title, and which was the most recent to be recorded as of a date forty years prior to the time when marketability is being determined. The effective date of the 'root of title' is the date on which it is recorded.' R.C. 5301.47(E). See *Toth*, supra, at 338." (Parallel citation omitted.) [*Ohio Turnpike Comm. v.*] *Spellman* [*Outdoor Advertising Servs., LLC*, 6th Dist. Erie No. E-09-038, 2010-Ohio-1705, appeal not allowed, 126 Ohio St.3d 1549], ¶17-18.

{¶93} "A '"(t)itle transaction" means any transaction affecting title to any interest in land, including title by will or descent, title by tax deed, or by trustee's, assignee's, guardian's, executor's, administrator's, or sheriff's deed, or decree of any court, as well as warranty deed, quit claim deed, or mortgage.' R.C. 5301.47(F)." *Spellman*, 2016-Ohio-7152, ¶38-54.

{¶94} With that detailed background, this writer now turns to the facts in this case. Chase argues the Ohio Marketable Title Act is inapplicable as to the Grays

23

because the time for measurement starts in 1981. According to Chase, because the 40-year measurement has not been met, the Act does not apply. I disagree.

{¶95} As stated, the legal descriptions in the Gau Jr. and Gau Sr. vacant parcels were derived from the 1981 incorrect deeds recorded by Chambliss and Hall. As such, the year 1981 (when the Gaus' parcels were conveyed to them from Chambliss and Hall) is significant for the Gaus, not the Grays.

{¶96} The Grays received their conveyance from the Odoms in 2003. The Odoms had owned the land since 1970. The extent of that property was determined in the Chambliss and Hall deeds dating back to 1962. In fact, the Grays can trace their legal description back to 1933. As the requisite 40 years had expired in the Grays' chain of title, the trial court erred in failing to apply the Ohio Marketable Title Act in order to rule out any challenge to the Gray property by Chase.

{¶97} I believe the Grays' second assignment of error has merit.

{¶98} In their third assignment of error, the Grays allege the trial court's November 18, 2014 judgment was against the manifest weight of the evidence.

{¶99} "The standard of review for manifest weight is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶17 * * *. Weight of the evidence concerns the greater amount of credible evidence offered in trial to support one side or the other of an issue. The party having the burden of proof will be entitled to a verdict if the trier of fact, on weighing the evidence, finds that the greater amount of credible evidence sustains the issue to be determined. *Id.* at ¶12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 * * * (1997). Moreover, the trier of fact may believe or disbelieve any or all of the testimony of a witness. *Swan v. Skeen*, 40 Ohio

24

App.2d 307, 308-09 * * * (10th Dist.1974).  On review, there is a presumption in favor of the decision of the trier of fact.  *Eastley* at ¶21.  The appeals court acts as a 'thirteenth juror' to determine whether the trier of fact lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered.  *Thompkins* at 387."  (Parallel citations omitted.)  *Smith v. Smith*, 11th Dist. Geauga No. 2013-G-3126, 2013-Ohio-4101, ¶42.

{¶100} Chase argues that its surveyor, O'Hara, found it necessary to go back in time to the 1800s because the legal description did not mathematically close.  However, the description could not mathematically close because the Gaus' predecessor-in-title built a house in 1964 on one parcel which spilled over the boundary of another parcel.

{¶101} Based on the facts presented in this case, I find the trial court's decision was not based on competent, credible evidence.  As addressed, the Grays' surveyor, Polles, testified regarding the omitted frontage and his reliance on the current deed of record.  The Chambliss and Hall deeds reconfigured the Gaus' property inasmuch that the adjoining Odom property, now the Grays, included the house at issue in its acreage.  The Gaus' northern boundary, which is the Grays' southern boundary, falls short of the house which is on the Grays' property.  Although Chase may have a right in foreclosure against the Gaus' property, any order of sale should not include the house which is located on the Grays' property.

{¶102} I believe the Grays' third assignment of error has merit.

{¶103} Accordingly, this writer finds appellants' assignments of error well-taken.  I would reverse the trial court's judgment and remand the matter for further proceedings.

{¶104} I respectfully dissent.